# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-13-00036-CV

**Cirrus Exploration Company, Appellant**

**v.**

**Susan Combs, Comptroller of Public Accounts of the State of Texas; and
Greg Abbott, Attorney General of the State of Texas, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
NO. D-1-GN-11-001851, HONORABLE JOSEPH H. HART, JUDGE PRESIDING**

## O P I N I O N

This is an appeal from a final summary judgment in favor of the Comptroller in a tax-refund suit.[1] The principal issue presented is whether appellant Cirrus Exploration Company's purchase of two helicopters qualifies for a sales-tax exemption under Tax Code section 151.328, which exempts from the imposition of sales tax aircraft that is "sold to a person using the aircraft as a certificated or licensed carrier of persons or property." Tex. Tax Code § 151.328(a)(1); *see* 34 Tex. Admin. Code § 3.294 (Comptroller of Pub. Accounts, Carriers) (related Comptroller rule).[2]

---

[1] Both the Comptroller and the Attorney General were defendants in the suit, *see* Tex. Tax Code § 112.053 (requiring Comptroller and Attorney General to be named as defendants in tax protest suit), but because their interests in this litigation align, we will refer to them collectively as the "Comptroller" for convenience.

[2] All references to Title 34 of the Texas Administrative Code are to rules promulgated by the Comptroller.

We will reverse the district court's judgment in favor of the Comptroller and render judgment for Cirrus instead.

**BACKGROUND**

The facts in this case are straightforward and undisputed. Cirrus is a Texas company that owns and operates a helicopter based out of Amarillo. Cirrus hires out its helicopter and a pilot to the public to serve in various activities and functions conducted from the air, including aerial tours, photography, surveys, and inspections. Cirrus's customers bring and operate their own equipment specific to the activity, choose the duration and scope of the flight, and decide on destinations and any interim stops. Cirrus simply provides the helicopter and pilot. Cirrus's helicopter and pilot operate in compliance with all necessary Federal Aviation Administration (FAA) regulations.

Between November 2005 and March 2006, Cirrus bought two new helicopters. The first, which cost Cirrus $233,431.02 after a trade-in, was destroyed shortly after purchase. Cirrus then purchased a second new helicopter, paying $373,048.20 from proceeds it received in compensation for losses related to the destruction of the first new helicopter. Cirrus did not pay sales taxes on either of these two helicopter purchases, instead presenting signed sales-tax exemption certificates to the seller at the time of each purchase.

At some point after these transactions, the Comptroller contacted Cirrus requesting information regarding its claim of sales-tax exemptions in connection with the helicopter purchases. Cirrus responded that the purchases were exempt under Tax Code section 151.328(a) because it holds a "Letter of Authorization" from the FAA that expressly authorizes it to conduct commercial

2

air tours under Part 91 of the FAA's regulations, specifically section 91.147. *See* 14 C.F.R. § 91.147 (FAA, "Passenger carrying flights for compensation or hire"). Part 91 sets forth the general operating and flight rules applicable to all aircraft operations in the United States. *See id.* § 91.1 ("Applicability"); *see also id.* § 91.1–.1605 (provisions of Part 91, titled "General Operating and Flight Rules"). As we will further detail as it becomes relevant to our analysis, FAA regulations impose a number of additional certification or licensing requirements specific to various defined categories of air carriers, but—significantly—the nature of Cirrus's business does not bring it within any of these additional FAA certification or licensing requirements. Instead, operators that fall outside these additional air-carrier regulations, like Cirrus, may conduct "passenger-carrying flights for compensation" if they meet the conditions set forth in section 91.147, which include applying for and obtaining a "Letter of Authorization" from the FAA. *See id.* § 91.147. Accordingly, Cirrus's carrier authorization under Part 91 is singularly sufficient legal authorization for its operations—at least as far as the FAA is concerned.

The Comptroller disagreed with Cirrus's view of the exemption, citing a "long-standing policy" of her office holding that FAA carrier authorization under Part 91 does not, in itself, qualify a person as a "licensed and certificated carrier" for purposes of Tax Code section 151.328(a). She ultimately assessed a liability determination against Cirrus in the amount of $66,900.06 for the tax period January 1, 2006 through June 30, 2006. Cirrus sought an administrative redetermination, but the Comptroller's determination was upheld by SOAH after a contested-case hearing. Thereafter, Cirrus paid the tax under protest—now $70,598.19 with accrued penalty and interest—and filed the underlying lawsuit in Travis County District Court. *See* Tex. Tax Code

3

§ 112.052 (authorizing suit to recover taxes after payment under protest); *see generally id.* §§ 112.001–.156 ("Taxpayers' Suits").

In its petition to the district court, Cirrus carried forward its assertions that it was a "certificated or licensed carrier" entitled to section 151.238's sales-tax exemption by virtue of the fact that it hires out its helicopter to carry persons and that it does so in full compliance with FAA regulations, including obtaining an "FAA Letter of Authorization" to conduct commercial air tours. *See* 14 C.F.R. § 91.147 (setting forth requirements for "conducting passenger-carrying flights for compensation or hire"); *cf.* 34 Tex. Admin. Code § 3.297 (Comptroller rule defining "licensed and certificated carrier" as person "authorized by [FAA] . . . to operate an aircraft . . . as a common or contract carrier"). The Comptroller responded that only persons holding one of the carrier-specific categories of FAA certification—which, again, Cirrus does not hold and is not required to hold—qualify as a "certificated or licensed carrier" entitled to the sales-tax exemption. Both parties filed competing motions for summary judgment on the sole issue of whether Cirrus qualified for section 151.328's licensed-carrier exemption. After a hearing, the district court issued a final judgment denying Cirrus's motion and granting the Comptroller's. It is from this judgment that Cirrus now appeals, arguing in two issues that the district court erred in granting the Comptroller's summary-judgment motion and denying its own because it is entitled to the exemption as a matter of law.

## STANDARD OF REVIEW

We review the district court's summary-judgment rulings de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). Summary judgment is proper if the

movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). When, as here, both parties move for summary judgment on overlapping grounds and the district court grants one motion and denies the other, we review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment that the trial court should have rendered. *Texas Workers' Comp. Comm'n v. Patient Advocates*, 136 S.W.3d 643, 648 (Tex. 2004).

In this case, as previously noted, the material facts are undisputed, such that the judgment rests solely on construction of Tax Code section 151.238 and Comptroller rule 3.297, questions of law that we review de novo under traditional principles of statutory construction. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011) (holding that administrative rules are interpreted under principles of statutory construction); *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008) ("Statutory construction is a legal question we review de novo."). Our primary objective in statutory construction is to ascertain and give effect to the drafters' intent. *See TGS-NOPEC*, 340 S.W.3d at 439 (citing Tex. Gov't Code § 311.005; *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care*, 145 S.W.3d 170, 176 (Tex. 2004)). We determine that intent from the plain meaning of the words chosen when it is possible to do so, using any definitions provided. *See id.* (citing Tex. Gov't Code § 311.011(b)). We consider the statutes or rules as a whole rather than their isolated provisions. *See id.* (citing *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004)). We presume that the enactment's language was chosen with care, with each word included (or omitted) purposefully.

*See id.* (citing *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008)). Undefined terms are typically given their ordinary meaning, but if a different or more precise definition is apparent from a term's use in context, we apply that meaning. *Id*. (citing *In re Hall*, 286 S.W.3d 925, 928–29 (Tex. 2009)). If the text of the enactment is unambiguous, we adopt the interpretation supported by its plain language unless such an interpretation would lead to absurd results that the drafters could not possibly have intended. *See id.* (citing *Mega Child Care*, 145 S.W.3d at 177). If the text is ambiguous, however, we may be required to defer to an authoritative administrative construction that is reasonable and consistent with the text of the provision. *See id.* at 438 ("If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, as there is here, we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule.").

## ANALYSIS

Tax Code section 151.328 exempts from the imposition of sales tax aircraft that is "sold to a person using the aircraft as a certificated or licensed carrier of persons or property." Tex. Tax Code § 151.328(a)(1). Comptroller Rule 3.297, in turn, provides that "[s]ales or use tax is not due on aircraft used by [a licensed and certificated carrier] in the regular course of business of transporting persons or property for hire." 34 Tex. Admin. Code § 3.297(d)(1). Rule 3.297 further defines "certificated and licensed carrier" as follows:

> **Licensed and certificated carrier**—A person authorized by the appropriate United States agency or by the appropriate state agency within the United States to operate an aircraft, vessel, train, motor vehicle, or pipeline as a common or contract carrier transporting persons or property for hire in the regular course of business.

6

*Id.* § 3.297(a)(1). Although neither the Tax Code nor the Comptroller regulations explicitly define the "carrier" component of this definition, both enactments' use of the term reflects a common meaning the term has acquired—i.e., someone who "contracts to transport passengers or goods for a fee." *Black's Law Dictionary* 242 (9th ed. 2009). Further, both sides agree that the "appropriate United States agency" in this context is the FAA. Thus, under the relevant statutory and regulatory text, a "certificated and/or licensed carrier" potentially entitled to the exemption is a person "authorized by" the FAA "to operate an aircraft . . . as a common or contract carrier transporting persons or property for hire in the regular course of business."

Both sides agree that Cirrus, in the regular course of its business, operates an aircraft as a common carrier.[3] They join issue, however, on what "authorized by the FAA" means in this context. Cirrus maintains that the phrase means merely that it holds whatever authorization it is required by law to obtain from the FAA in order to carry persons or property for hire in the manner it does. Accordingly, Cirrus concludes, it is a "licensed and certificated carrier" under this definition because the FAA authorizes it to conduct, in the regular course of its business, passenger-carrying flights for compensation. In fact, Cirrus observes, it holds a "Letter of Authorization" under FAA regulation 91.147 that specifically authorizes Cirrus to conduct passenger-carrying flights for compensation. *See* 14 C.F.R. § 91.147 (setting forth Part 91 requirements for operators "conducting passenger-carrying flights for compensation or hire").

---

[3] A "common carrier" is a carrier that holds itself out to the public as willing to furnish transportation to anyone who wants it. *See Black's Law Dictionary* 242 (9th ed. 2009). By contrast, a "private" carrier (sometimes also called a "contract" carrier) is not bound to accept business from the general public; instead, it usually carries one or select customers, generally on a long-term basis. *See id.*

7

In response, the Comptroller continues to emphasize her office's "long-standing" policy, reflected in Comptroller decisions dating from at least 1982, that an air carrier is not a "licensed or certificated carrier" unless it is "certificated under a provision that specifically qualifies it to be used to carry persons or property for hire," as opposed to being merely "authorized" or permitted by law to do so. Comptroller Decision No. 13,505 (1982); *see* Comptroller Decision No. 103,511 (2006) ("Comptroller's long-standing policy is that an air carrier cannot be a licensed and certificated carrier unless it is authorized under [specific FAA regulations]."). The provisions that "specifically qualify" a person to be a common carrier in this context, the Comptroller has reasoned, are Parts 121, 125, or 135 of the FAA's regulations, which, as we will detail shortly, govern commercial airlines, private carriers using large aircraft, and short-distance/commuter carriers, respectively.[4] *See, e.g.*, Comptroller Decision No. 13,505 (Part 135); Comptroller Decision No. 103,511 (Parts 121 and 135). Consequently, this "long-standing policy" further holds, a person who operates an aircraft solely under Part 91 of the FAA regulations, like Cirrus here, is not a licensed and certificated carrier. *See* Comptroller Decision No. 13,505 ("It is the position of the [Comptroller] that operation under Part 91 alone does not qualify an aircraft as a licensed and certificated carrier, even though, as is the case here, the aircraft may be used to carry people for hire.").

The Comptroller does not elaborate as to an underlying rationale for this "long-standing policy" (apart from her emphasis on the existence of prior Comptroller decisions that have espoused it), but the view would seem to derive from the organization and structure of the

---

[4] *See* 14 C.F.R. §§ 119.5, .21–.25.

FAA regulations themselves. As mentioned above, Part 91 of these regulations contains the general operating and flight rules applicable to all aircraft operations in the United States, *see* 14 C.F.R. § 91.1 ("Applicability"), including for example, the familiar FAA regulation requiring that all aircraft be equipped with emergency locator transmitters, *see id.* § 91.207(a). Subchapter G sets forth FAA rules that are specific to commercial air carriers. *See id.* §§ 119.1–139.343 ("Air Carriers and Operators for Compensation or Hire: Certification and Operations"); *see also* 49 U.S.C. §§ 41101(a) (provision of Federal Aviation Act specifying that "air carrier may provide air transportation only if the air carrier holds a certificate . . . authorizing the air transportation"), 41701 (directing FAA to establish regulations regarding classifications of air carriers and requirements each of those classifications must meet). Specifically, Subchapter G provides that flights involving the carriage of persons or property for compensation or hire must be conducted with a commercial operating certificate issued under Parts 121, 125, and 135. *See* 14 C.F.R. § 119.1(b) (setting forth types of FAA "air operator certificates" and prescribing certification requirements operator must meet in order to obtain and hold certificate authorizing operations under part 121, 125, or 135"); *Department of Transp. Federal Aviation Admin., Legal Interpretation*, 2008 WL 2204585 (Feb. 4, 2008). Parts 121, 125, and 135 cover the following types of commercial air carriers:

- Part 121—major commercial airlines;

- Part 125—private (non-common) carriers using large aircraft; and

- Part 135—short-distance (commuter) and on-demand (air taxis and charters) carriers, both common and private.

9

*See* 14 C.F.R. §§ 119.5, .21–.25.  Thus, as a general rule, FAA regulations require that all air-carriers—i.e., anyone who transports people or property by air—to both comply with Part 91 and be certified under Parts 121, 125, or 135 of the FAA regulations.[5]  However, as we have previously indicated, this is not always true.

As Subchapter G provides:

[Part 119] does not apply to—

. . .

(2)      Nonstop Commercial Air Tours . . . in a helicopter . . . that begin and end at the same airport, and are conducted within a 25-statute mile radius of that airport, in compliance with a Letter of Authorization issued under § 91.147 . . . .

. . . .

(4)      Aerial work operations, including—

. . .

    (iii)    Aerial photography or survey;

    . . .

    (vi)    powerline or pipeline patrol; . . . .

*Id.* § 119.1(e).  It is undisputed that Cirrus's air-carrier operations—i.e., sightseeing or aerial photography or surveying flights—come within this exception or exclusion from the FAA regulations specific to air carriers.  Consequently, FAA regulations do not require Cirrus to obtain,

---

[5] Section 119.25 specifies that carrier operations conducted using helicopters must comply with Part 135's certification requirements.  *See* 14 C.F.R. § 119.25.

and it has not obtained, carrier certification under Parts 121, 125, or 135 in order to transport people or equipment for hire. Instead, FAA regulations allow Cirrus to operate its carrier flights solely under the general flight rules set forth in Part 91, which include specific requirements for obtaining a Letter of Authorization to operate air tours.

The gravamen of the Comptroller's "long-standing policy" is that "licensed or certificated carrier," as contemplated in Tax Code section 151.328 and Comptroller Rule 3.297, is defined and limited by the FAA's certification requirements under Parts 121, 125, or 135, such that a carrier who is not required to comply with these requirements in order to operate lawfully, such as Cirrus, cannot possibly be entitled to the exemption. This construction is squarely contrary to the unambiguous language of the Comptroller's own Rule 3.297, which again defines "licensed and certificated carrier" as "[a] person *authorized* by the appropriate United States agency [i.e., the FAA] to operate an aircraft, vessel, train, motor vehicle, or pipeline as a common or contract carrier transporting persons or property for hire in the regular course of business." 34 Tex. Admin. Code § 3.297(a)(1) (emphasis added). "Authorize," the term the Comptroller has chosen, merely denotes the conveyance or recognition of legal authority or permission,[6] and it is not limited to the conveyance of legal authority or permission through the issuance of a certificate or license, or of any particular kind of certificate or license.[7] Nor does the rule itself specify any. Rather, there is no

---

[6] *See Webster's Third New Int'l Dictionary* 146 (2002) (defining "authorize" as "to endorse, empower, justify, or permit"); *Black's Law Dictionary* 153 (9th ed. 2009) (defining "authorize" as "to give legal authority; to empower . . . . [t]o formally approve").

[7] *Cf. Webster's* at 367 (defining "certificate[d]" as "authorize[d] . . . or . . . license[d] by a certificate"), 1304 (defining "licensed" as "permit[ted] or authorize[d] esp[ecially] by formal license").

textual support in the Comptroller's rule for her narrowing of "authorized by the FAA" to require certain, specific types of FAA carrier *certifications* that, while undeniably authorizing carrier operations, are not the only methods by which the FAA authorizes commercial air carrier operations.

The Comptroller urges us to defer to its "long-standing" construction of this rule, but as the Texas Supreme Court has recently and repeatedly explained, agency deference of this type is appropriate only where the statute or rule in question is ambiguous. *See Texas Coast Utils. Coal. v. Railroad Comm'n*, __S.W.3d __, No. 12-0102, 2014 WL 185030, at *6 n.16 (Tex. Jan. 17, 2014) (noting that agency-deference doctrine not implicated where statute at issue is unambiguous); *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011) (noting that agency deference is only appropriate where language at issue is vague (citing *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747–48 (Tex. 2006)). The Comptroller's definition of "certificated and licensed carrier" is not vague or unclear. Rather, it unambiguously requires that the person seeking the air-carrier exemption be "authorized" by the FAA to operate as a carrier. *See* 34 Tex. Admin. Code § 3.297(a)(2). While the word "authorize" alone may have broad application, the phrase "authorized by the [FAA] . . . to operate an aircraft . . . as a common carrier" is not susceptible to more than one reasonable meaning. Accordingly, we need not defer to the Comptroller's construction. *See Texas Coast Utils.*, 2014 WL 185030, at *6 n.16; *Texas Citizens*, 336 S.W.3d at 625. Further, even if deference were appropriate here, the Comptroller's construction and application of this rule is unreasonable and inconsistent with the text of the rule given that it improperly narrows the types of carrier authorizations allowed. *See Texas Citizens*, 336 S.W.3d

12

at 628 (noting that where there is ambiguity requiring deference, we defer only to reasonable interpretation).

Because Cirrus is authorized by the FAA to operate its helicopter as a common carrier transporting persons or property for hire in the regular course of its business, it is a "licensed and certificated carrier" under the Comptroller's regulations. Accordingly, and given that there are no remaining disputed issues relevant to Cirrus's entitlement to the exemption, the two helicopter purchases are exempt from the imposition of sales tax. We sustain Cirrus's two issues on appeal.

## CONCLUSION

Having sustained Cirrus's two issues on appeal, we reverse the district court's judgment and render judgment in favor of Cirrus in the amount of $70,598.19, plus interest as allowed under the Tax Code. *See* Tex. Tax Code § 112.155 (entitling successful taxpayer to interest on amount of tax paid).

_____
Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Rose

Reversed and Rendered

Filed: February 12, 2014

13