**Reversed and Rendered and Opinion filed November 3, 2015.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-14-00798-CV

---

### DERRICK M. SAULSBERRY, Appellant

### V.

### WENDY ROSS, INDIVIDUALLY AND ON BEHALF OF TEXAS SPRAY-ON BEDLINERS L.L.C., Appellee

---

**On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Cause No. 2010-61337**

---

### O P I N I O N

In this appeal from the judgment rendered after a bench trial in a legal-malpractice case, the appellant attorney Derrick M. Saulsberry argues, *inter alia*, that the evidence is legally insufficient to support the finding that he had a continuing attorney–client relationship with appellee Wendy Ross or to support the damage award of $63,483.81. We conclude that the evidence supports the finding that Saulsberry was Ross's attorney at all relevant times, but that the evidence is

legally insufficient to support an award of damages. After severing from the case those portions of the judgment that were not challenged on appeal, we reverse the judgment in Ross's favor and render judgment that Ross take nothing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

When an attorney has been successfully sued for professional negligence in connection with litigation, the appeal generally requires discussion both of the malpractice case and of the underlying case in which the malpractice allegedly occurred.[1] Here, however, we must discuss three underlying cases. We summarize the evidence in accordance with the applicable standard of review.[2]

### A. The Original Suit

At one time, Wendy Ross and Larry Young worked for TOFF Custom Sprayed On Liners, Inc. ("TOFF"), a company that sold and applied spray-on truck-bed liners. After leaving TOFF's employ, Ross worked for a competitor, then started a similar business in which she employed Young. Ross operated the business as a sole proprietorship under an assumed name.

TOFF sued Ross and Young, alleging that Young violated a non-compete agreement and that Ross appropriated TOFF's funds and infringed upon its trademark. Ross retained Saulsberry to defend both herself and Young. The parties ultimately settled their differences, agreeing that (1) Ross and Young would purchase a total of twelve sets of chemicals from TOFF over a period of one year; (2) the parties would approve an agreed judgment in TOFF's favor for $15,000; and (3) TOFF would not attempt to execute on the judgment against Ross and

---

[1] *See, e.g.*, *Schlager v. Clements*, 939 S.W.2d 183, 186–87 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ("To prevail in a legal malpractice action, a plaintiff must prove 'a suit within a suit' by demonstrating that he would have prevailed in the underlying action but for his attorney's negligence.").

[2] *See* Section II, *infra*.

2

Young for so long as they complied with the settlement agreement. The parties also agreed that "[a]ll notices, requests, demands and other communications under this [Settlement] Agreement or any instrument contemplated hereby" would be mailed or personally delivered "to the address of the counsel for [the] respective parties." As Ross and Young's attorney, Saulsberry approved the agreed judgment, which incorporated these terms.

Three months after the trial court signed the final judgment in the original suit, Ross went to a second attorney, Mark Morasch, to form the limited-liability company Texas Spray-On Bedliners, L.L.C. ("Spray-On Bedliners"). There is no evidence that she informed Saulsberry of the new company's existence.

## B. The Alleged Malpractice and the Breach-of-Contract Suit

Ross and Young did not purchase twelve sets of chemicals from TOFF as required by the settlement agreement, and Ross admitted in the trial of this case case that she breached the agreement. On September 11, 2008, TOFF's attorney Alan Magenheim wrote to Saulsberry, informing him that only six of the promised twelve sets of chemicals had been purchased, and stating that TOFF intended both to sue for breach of contract and to execute on the judgment unless Ross paid TOFF more than $18,000 within six days. Later that month, Magenheim wrote to Saulsberry again and extended the deadline for payment to September 26, 2008.

Ross admitted at trial that Saulsberry called her at the end of September or the first of October and told her that TOFF was threatening to sue her. Ross testified that when she spoke with Saulsberry, she told him that she had purchased six sets of chemicals and asked if she should buy another set. According to Ross, Saulsberry said he would speak with TOFF's attorney and get back to her, but Saulsberry never called Ross backed. She testified that, based on her conversation with Saulsberry, she believed she had no further obligation to TOFF.

3

On October 7, 2008, Magenheim wrote to Saulsberry that TOFF had sued Ross for breach of contract. In the same correspondence Magenheim enclosed post-judgment discovery in which TOFF sought to identify Ross's means of satisfying the judgment in the original suit. At the same time, Magenheim sent Saulsberry a courtesy copy of the notice of intent to execute, which also had been filed that day. Saulsberry did not send Ross any of this material; he did not tell Ross that TOFF had filed a new breach-of-contract suit against her; and he did not tell Ross or opposing counsel that he, Saulsberry, no longer represented Ross.

One week after the suit was filed, Ross purchased the additional set of chemicals that she had discussed with Saulsberry. About a month later, Magenheim wrote Saulsberry that TOFF was "not willing to compromise" in enforcing the agreed final judgment in the original suit.

On December 3, 2008, Ross was served with process in TOFF's new breach-of-contract action, but she testified that she was unconcerned because she assumed everything was okay. She left for a short vacation without reading the papers.

## C.     The Property Seizure and the Suit for Injunctive Relief[3]

On December 8, 2008, constables seized personal property from Spray-On Bedliners' place of business, with proceeds from the sale to be applied to the agreed judgment from TOFF's original suit. An employee of Spray-On Bedliners telephoned Ross about the seizure, and Ross called Saulsberry. Once again Saulsberry told Ross that he would call her back after speaking with TOFF's attorney, and once again he failed to do so.

Ross returned to Houston and arranged for Morasch, the attorney who had

---

[3] We refer to this as the "suit for injunctive relief" because the record before us shows the relief that Ross and Spray-On Bedliners sought in that action, but does not show the causes of action asserted, if any.

4

set up Spray-On Bedliners, to represent her and the company. Four days later, Morasch, acting on behalf of Ross and Spray-On Bedliners, filed a separate action against TOFF to obtain a temporary restraining order and an injunction to prevent the sale of the seized property. TOFF agreed to return three pieces of equipment and to allow Ross to recover personal papers that had been among the seized property; Ross agreed that the remainder of the seized property could be sold.

At Morasch's request, the trial court consolidated all of the cases between TOFF and Ross. Nearly a year after the TOFF filed its breach-of-contract action, it reached a "walk-away" agreement with Ross and Spray-On Bedliners in which the parties released their claims and counter-claims against one another without further payment, with each party bearing its own costs.

## D.    The Malpractice Suit

Ross and Spray-On Bedliners sued Saulsberry for legal malpractice, and maintained at trial that Saulsberry breached the standard of care by failing either to forward TOFF's post-judgment discovery requests to Ross or to provide written notice to Ross and opposing counsel that he was terminating his representation.[4] Morasch testified without objection that TOFF's attorney "communicated with me that he would not have filed for the writ of execution had he known there was no money left." Thus, according to Ross, TOFF would not have seized the personal property at Spray-On Bedliners' place of business but for Saulsberry's failure to

---

[4] The malpractice suit was styled, "*Wendy Ross, individually and on behalf of Texas Spray-On Bedliners, L.L.C. v. Derrick M. Saulsberry*," and on appeal, Saulsberry repeated that style, reversing only the order of the parties to reflect that he is the appellant. Despite the style of the case, Ross and Spray-On Bedliners are separate parties, and this is accurately reflected in the judgment, in the findings of fact and conclusions of law, and in the body of the parties' pleadings. *See also* TEX. BUS. ORGS. CODE ANN. § 101.113 (West 2012) ("A member of a limited liability company may be named as a party in an action by or against the limited liability company only if the action is brought to enforce the member's right against or liability to the company.").

respond to the post-judgment discovery. Saulsberry counterclaimed for the fees Ross owed him for representing her in TOFF's original suit.

The trial court found that Saulsberry was not liable to Spray-On Bedliners, but held him liable to Ross in the amount of $63,483.81, representing the value of the seized property, the expenses paid or incurred to operate Spray-On Bedliners after the seizure, and all of the fees Morasch charged for representing both Ross and Spray-On Bedliners. After offsetting this amount by $10,162.70, representing the amount of Saulsberry's unpaid legal fees and his costs of collection, the trial court rendered judgment in Ross's favor for $53,321.11. Only the portion of the judgment in Ross's favor has been challenged on appeal.

## II. STANDARD OF REVIEW

Saulsberry presents us with six issues and many subsidiary arguments that are not reflected in his statement of the issues, but we need address only his dispositive legal-insufficiency arguments.

Where, as here, a case is tried without a jury and the trial court issues findings of fact, the reviewing court is bound by any unchallenged factual finding unless the evidence is legally insufficient to support it. *See Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696–97 (Tex. 1986)). If at least one of the elements of a ground of recovery or defense has been included in the findings, any omitted unrequested elements that are supported by the evidence are supplied by a presumption in support of the judgment. TEX. R. CIV. P. 299.

When reviewing the sufficiency of the evidence to support the trial court's express or implied findings, we apply the same standards of review that apply to a jury's verdict. *See MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d

6

660, 663 n.3 (Tex. 2009) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)). To analyze the legal sufficiency of the evidence, we review the record in the light most favorable to the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). The evidence is legally insufficient to support the finding only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller,* 168 S.W.3d at 810. Because it is the factfinder's responsibility to weigh credibility and resolve conflicts in the evidence, we will defer to those determinations so long as they are reasonable. *See id.* at 820. On the other hand, reasonable factfinders "are not free to believe testimony that is conclusively negated by undisputed facts" and "cannot disregard undisputed evidence that allows of only one logical inference." *Id.* at 820, 814.

### III. THE EXISTENCE OF AN ATTORNEY–CLIENT RELATIONSHIP

Because it is a threshold issue, we begin with Saulsberry's contention that his attorney–client relationship with Ross ended when judgment was entered in the original suit, and that there is legally insufficient evidence that he and Ross later established a new attorney–client relationship A plaintiff asserting a legal-malpractice claim bears the burden to establish that (a) the defendant owed the plaintiff a duty, (b) the defendant breached the duty, (c) the breach proximately

7

caused the plaintiff's injury, and (d) the plaintiff sustained damages. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 112 (Tex. 2009). If an attorney–client relationship exists, then the attorney has a duty to the client to act with the care expected of a reasonably prudent attorney. *See Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*, 284 S.W.3d 416, 426 (Tex. App.—Austin 2009, no pet.). Thus, the threshold issue in this case is whether Saulsberry and Ross had an attorney–client relationship giving rise to such a duty.

According to Saulsberry, we must reverse the judgment in Ross's favor because the trial court's legal-malpractice finding is based on events that occurred after Saulsberry and Ross's attorney–client relationship ended. Saulsberry begins with the proposition that, absent a contrary agreement, "an attorney–client relationship generally terminates upon the completion of the purpose of the employment." *Stephenson v. LeBoeuf*, 16 S.W.3d 829, 837 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (op. on reh'g). According to Saulsberry, he agreed to represent Ross when she was originally sued by TOFF, so his representation ended upon the entry of final judgment in that case. Saulsberry contends there is insufficient evidence that the attorney–client relationship was renewed, because Ross neither alleged nor offered evidence of "a new written agreement concerning representation in post-judgment matters." He therefore concludes that he cannot be liable to Ross for legal malpractice based on conduct that occurred after judgment was entered in the original TOFF suit because he was no longer her attorney after that date.[5] *But see Hamilton v. Hamilton*, 225 S.W. 69, 70 (Tex. Civ.

---

[5] Ross argues in her responsive brief that Saulsberry also was negligent in representing her in TOFF's original action, but the trial court made no such finding. It instead found that Saulsberry failed to use ordinary care in representing Ross "in the collection matter made the basis of this suit." The trial court explained that "[t]he matter made the basis of this suit concerns the attempted collection of a prior judgment and settlement agreement."

App.—Austin 1920, writ dism'd w.o.j.) (stating that an attorney's representation generally ends upon entry of final judgment, but adding that "[i]t may also be stated, as a general proposition, that the authority of an attorney to represent his client continues as to all matters regarding the enforcement of the judgment").

Saulsberry's reliance on the absence of a written contract is misplaced: an attorney–client relationship is not dependent on the existence of a written contract, but may be implied by the parties' objective words and actions. *See Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 105 S.W.3d 244, 254 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g). Saulsberry never had a written agreement with Ross expressly addressing the scope or duration of his representation—even during the time he admittedly represented her in the original TOFF suit—but there is ample evidence that he continued to represent her until she hired Morasch after the writ of execution was served.

To begin with, both the judgment and the settlement agreement in the original TOFF suit contemplated Saulsberry's continuing attorney–client relationship with Ross. In the judgment, the trial court awarded TOFF $15,000, but ordered that "[TOFF] shall not make any attempt to execute on this judgment, unless or until, a sworn Affidavit is presented, *with prior written notice to counsel for Defendants*[,] to the Court . . . representing that the Defendants have failed to abide by" the settlement agreement.[6] The settlement agreement also provided that "[a]ll notices, requests, demands and other communications under this Agreement or any instrument contemplated hereby shall be in writing and shall be personally delivered or mailed . . . to the address *of the counsel for respective parties hereto . . . .*"[7] The judgment and the settlement agreement each incorporated the

---

[6] Emphasis added.

[7] Emphasis added.

other's terms, and acting as Ross and Young's attorney, Saulsberry signed the judgment under the line, "Approved and Entry Requested."[8]

Saulsberry contends that these documents required him merely to act as a sort of registered agent for the receipt of notices concerning any alleged breach of the settlement agreement. The documents, however, do not require communications to be sent to an "agent" or even to "Derrick M. Saulsberry"; they require communications to be sent to "counsel," and Saulsberry admits that he never informed TOFF's attorney that he no longer represented Ross. Although it is appropriate to communicate with a represented party through counsel,[9] the settlement agreement and judgment address the transmittal of post-judgment communications, so if Saulsberry's representation was to end when judgment was rendered, then there is no apparent reason why such post-judgment communications should not have been sent directly to Ross. Moreover, even if the settlement agreement and the agreed judgment did not require Saulsberry to continue acting as Ross's attorney, we still would be left with the question of whether he in fact did so.

To answer that question, we look to the parties' objective words and actions and determine whether their conduct is that of an attorney and client or is instead, as Saulsberry contends, analogous to that of a registered agent and principal. Saulsberry's expert Ron Rainey testified that such an agent is required only to forward material to the principal or to notify the principal that material was received, but has no obligation to communicate with the sender. Rainey further explained that in contrast to such an agent, an attorney offers advice or guidance.

---

[8] Full capitalization has been changed to initial capitals.

[9] *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 4.02(a), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (West 2013) (TEX. STATE BAR R. art. X, § 9).

10

He stated that an attorney is not required to send a client a copy of every document received from opposing counsel, but instead could telephone the client to explain the document.

Regardless of Saulsberry's subjective belief that he no longer represented Ross, his objective conduct was that of Ross's attorney. Saulsberry testified that when he received the notice, he called TOFF's attorney "to inquire as to why [opposing counsel] felt that Ms. Ross and Mr. Young were in violation of the settlement agreement and what they needed to do to comply." Although Saulsberry did not send Ross any of the material received from opposing counsel, he telephoned her and said that TOFF had threatened to execute on the judgment. Saulsberry further testified that when he spoke with Ross, "she asked me what should she do. And I said, 'You need to comply with the terms of the settlement agreement. You comply with the terms of the settlement agreement, everything will be fine.'" Ross remembers the conversation differently. She testified that when Saulsberry told her of TOFF's threat to execute on the judgment, she suggested to Saulsberry that TOFF might be satisfied if she purchased another set of chemicals. According to Ross, Saulsberry told her to purchase the additional set of chemicals, and that he would contact TOFF's attorney and call her back. Although Saulsberry denied ever discussing a compromise offer with Ross or opposing counsel, TOFF's attorney recalled being asked whether TOFF would be satisfied if Ross purchased one more set of chemicals. The documentary evidence further shows that one week after Ross purchased the additional chemicals, TOFF's attorney wrote to Saulsberry that TOFF was not willing to compromise. Finally, Saulsberry's own expert conceded at trial that even if the settlement agreement only required Saulsberry to act as "a conduit to provide notice," Saulsberry nevertheless continued to act as Ross's attorney by speaking with

11

opposing counsel on her behalf and by offering Ross advice.

The evidence shows that this attorney–client relationship ended after property was seized at Spray-On Bedliners' place of business on December 8, 2008. Both Saulsberry and Ross testified that they last spoke when Ross called Saulsberry to say that constables were seizing equipment at her place of business. Saulsberry did not assist her, and from that date forward, attorney Mark Morasch represented both Ross and Spray-On Bedliners in their litigation with TOFF.

Because the foregoing evidence is legally sufficient to establish that Saulsberry represented Ross from the time of TOFF's first demand letter until the writ of execution was served, we overrule this issue.

## IV. DAMAGES

During their attorney–client relationship, Saulsberry owed Ross a duty to act as a reasonably prudent attorney could do in the same or similar circumstances based on the information that Saulsberry had at the time of the alleged malpractice. *See Cosgrove v. Grimes*, 774 S.W.2d 662, 664–65 (Tex. 1989) (op. on reh'g); *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.*, 48 S.W.3d 865, 874 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). On appeal, Saulsberry does not dispute that if he had a continuing attorney–client relationship with Ross, then he breached this duty. He instead challenges the sufficiency of the evidence to support the remaining elements of Ross's legal-malpractice claim. He argues that there is no evidence that his negligence proximately caused Ross's claimed damages. Regarding the amounts awarded for the value of the seized property, Saulsberry additionally argues that there is no evidence of the correct measure of damages. We conclude that each of these arguments is in some measure correct, and taken together, they eliminate all of the damages awarded. Specifically, these points eliminate the trial court's award to Ross of $63,483.81, which is the sum of

12

(a) $38,850.00 for the attorney's fees incurred, but not yet paid, for Morasch's representation of both Ross and Spray-On Bedliners;[10] and (b) $24,633.81, representing the sum of (i) the expenses to operate Spray-On Bedliners after the seizure, and (ii) the value of the seized property that was sold.

## A.    Proximate Cause

Proximate cause consists of cause in fact and foreseeability. *Akin, Gump*, 299 S.W.3d at 122 (citing *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)). To establish the cause-in-fact element, a plaintiff must prove that (1) the defendant's negligent act or omission was a substantial factor in bringing about the harm at issue, and (2) the harm would not have occurred but for that act or omission. *See id.* Neither of these components can be established by conjecture, guess, or speculation. *See id.* If the causal link between an attorney's negligence and the client's harm is beyond a jury's common understanding, then proximate cause must be proved through expert testimony about what the attorney should have done. *See Alexander v. Turtur & Assocs.*, 146 S.W.3d 113, 119–20 (Tex. 2004). The expert testimony must tie "the specific conduct that is in issue" to the client's adverse result. *See id.* at 119 (quoting 5 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 33.17 at 138–39 (5th ed. 2000)).

Our first task, then, is to identify the specific conduct that Ross claims harmed her. Morasch testified that under the applicable standard of care, an

---

[10] The Texas Supreme Court has held that a successful legal-malpractice claimant may recover as damages those attorney's fees that were both proximately caused by the malpractice and actually paid. *See Akin, Gump*, 299 S.W.3d at 122. The court expressly declined to state whether the result would be the same if the fees incurred had not been paid. *Id.* at 111, n.3. Because Saulsberry challenges the award of attorney's fees on different grounds, we assume for the purposes of this opinion that if an attorney's professional negligence proximately caused a client to incur attorney's fees in an underlying suit, the fees incurred are recoverable as damages even if the client has not yet paid them.

attorney who terminates his representation of a client must (1) notify both the client and opposing counsel of that fact in writing, (2) allow the client sufficient time to obtain other representation, and (3) continue to represent the client in the interim. Saulsberry admits that he did not notify Ross in writing that he was terminating his representation.

Morasch further testified that while Saulsberry continued to represent Ross, he was required to forward to Ross the communications and discovery requests he received from TOFF's attorney. Saulsberry's own expert also testified that if the attorney receives discovery requests for a client to answer, then the attorney must send the client a copy of the requests. There also is evidence in the record that TOFF's post-judgment discovery requests were hand-delivered to Saulsberry on October 7, 2008, and it is undisputed that Saulsberry neither responded to the requests nor sent copies to Ross.[11] Ross therefore contends that Saulsberry deprived her of the opportunity to answer the discovery by failing either to act on the discovery requests or to terminate his representation in writing so that Ross could obtain other counsel to do so.

In questions posed to witnesses and in argument to the trial court, Ross's trial counsel implied that Saulsberry committed other unnamed omissions. For example, when questioning Saulsberry's expert, Ross's counsel suggested that Saulsberry did not "take any other steps to create a position which would leverage [TOFF's attorney] to back off." In closing argument, Ross's counsel asserted, "You push back in litigation. You create settlement positions. It happens all the time. And then you put your client in a different situation. [Saulsberry] didn't

---

[11] TOFF's attorney testified that a copy of the petition and the discovery requests were hand-delivered to Saulsberry. Saulsberry admits receiving the cover letter that accompanied them, but denies that the discovery requests and petition were enclosed. Because a reasonable factfinder could credit the evidence that this material was delivered, we presume that the trial court did so.

14

have to do all that, but he had to give somebody else the opportunity to do it if he wasn't going to . . . ."[12] These references suggest a reason why an attorney might want to take additional actions, but there is no expert testimony about what those additional acts would be or whether the failure to perform them would breach the standard of care. These elements must be proved; a trial court cannot draw on its own knowledge about the practice of law to fill in these evidentiary gaps. *See Primis Corp. v. Milledge*, No. 14-08-00753-CV, 2010 WL 2103936, at *3 n.1 (Tex. App.—Houston [14th Dist.] May 27, 2010, no pet.) (mem. op.) (explaining that even though a trial judge may be able to evaluate whether an attorney's conduct breached the standard of care or caused damages, a trial judge's private thoughts are not evidence; thus, if such matters would be outside the common understanding of a jury, then expert testimony is required even if the factfinder is the trial court). Consequently, the only specific conduct that Ross identified and tried to causally link to a cognizable injury was Saulsberry's failure either to forward TOFF's discovery requests to Ross or to provide written notice that he was terminating his attorney–client relationship so that Ross could hire another attorney to assist her in responding to the discovery.[13] For the reasons discussed below, we conclude there is legally insufficient evidence that this conduct proximately caused Ross to incur personal responsibility for Spray-On Bedliners' attorney's fees and

---

[12] *But cf. Wohlstein v. Aliezer*, 321 S.W.3d 765, 774 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("Texas law does not currently recognize 'lost bargaining leverage,' by itself, as a legally compensable injury.").

[13] Although Ross also asserted that Saulsberry negligently represented her in TOFF's original suit, the trial court's only finding of professional negligence is limited to Saulsberry's representation of Ross during TOFF's attempt to collect the original judgment. That period began when TOFF sent a demand letter to Saulsberry on September 11, 2008, and ended when Morasch replaced Saulsberry as Ross's attorney on December 8, 2008. We therefore do not discuss the sufficiency of any evidence that Saulsberry negligently represented Ross in TOFF's original suit, because we could not affirm or reverse the judgment on that basis. *See* Tex. R. Civ. P. 299.

15

business expenses. Regarding Ross's own attorney's fees, we conclude there is no evidence that, but for Saulsberry's negligence, she would not have incurred the same amount of fees.

### 1. There is no evidence that Saulsberry proximately caused Ross to incur personal responsibility for Spray-On Bedliners' attorney's fees.[14]

Although the trial court found that Spray-On Bedliners was not Saulsberry's client and rendered a take-nothing judgment on the company's claims against him, the court nevertheless awarded Ross all of the attorneys' fees that Morasch billed for representing both her and the company. But, a member or manager of a limited-liability company is legally distinct from the company itself. *See Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 109 (Tex. App.—San Antonio 2011, pet. denied). Absent an agreement to the contrary, a member or manager of a limited-liability company is not liable for the company's obligations. *See* TEX. BUS. ORGS. CODE ANN. § 101.114 (West 2012) ("Except as and to the extent the company agreement specifically provides otherwise, a member or manager is not liable for a debt, obligation, or liability of a limited liability company, including a debt, obligation, or liability under a judgment, decree, or order of a court."); *ACS Partners, LLC v. Gross*, No. 01-11-00245-CV, 2012 WL 1655547, at *3 (Tex. App.—Houston [1st Dist.] May 4, 2012, no pet.) (mem. op.) ("[T]here is a presumption of legal separateness between a limited liability company and its managers."); *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 590 (Tex. App.— Houston [1st Dist.] 2007, pet. denied) ("Generally, members are not individually liable for the debts of the LLC.").

---

[14] Ross's only evidence of attorney's fees does not distinguish between amounts incurred for Spray-On Bedliners' legal representation and amounts incurred for Ross's representation. We nevertheless discuss them separately because we have slightly different reasons for concluding that the evidence for each is legally insufficient.

The fees incurred for legal work on claims by or against Spray-On Bedliners are a company obligation for which Ross had no individual liability unless she chose to accept it. If Ross is now obligated to pay the company's attorney's fees, it is not because Saulsberry proximately caused her to incur them; it is because Ross agreed to assume personal responsibility for the company's obligation. Given the unchallenged finding that Saulsberry is not liable to Spray-On Bedliners, the evidence is legally insufficient to support Ross's recovery of attorney's fees for work performed on the company's claims and defenses.

2. **There is no evidence that Saulsberry proximately caused Ross to incur personal responsibility for Spray-On Bedliners' post-seizure business expenses.**

Just as Ross is not entitled to recover Spray-On Bedliners' legal expenses, she also is not entitled to recover the company's business expenses. To clarify which expenses these are, we must break down the damages award into its component parts.

Ross requested $38,850.00 for the attorney's fees billed by Morasch and $24,633.81 as compensation for the losses and expenses described in a specific exhibit, Plaintiff's Exhibit 1-U. That exhibit consists of two tables followed by several pages of receipts and invoices. The first table is labeled, "Replacement Items," and the second is labeled "Seized Property – Sold at Auction." Ross sought compensation of $10,892.69 for the expenses listed in the "Replacement Items" table, and $13,741.12 for the value of the property shown in the "Seized Property" table, and the trial court awarded the full amount requested. The present discussion concerns only the first table, "Replacement Items."

Although one might assume from the titles of the two tables that "Replacement Items" summarizes the expenses incurred to replace the seized property that was sold at auction, this is incorrect. Most of the entries in the

"Replacement Items" table do not correspond to property that was seized and sold; some of the "items" are not even property, but instead are fees paid for services Ross explained that the entries in the "Replacement Items" table are the expenses paid or incurred to operate Spray-On Bedliners after the property seizure on December 8, 2008. Although Ross and her trial counsel seldom acknowledged a distinction between Ross and the company, it is clear from the references to "business," "customers," and having trucks "sprayed" that the "Replacement Items" in Plaintiff's Exhibit 1-U were Spray-On Bedliners' business expenses:

Q:   As a result of the seizure of your property on December 8th, 2007, how did you, if at all, did you continue to conduct business that month?

A:   The following day I had one [customer's] truck. I went down the street to a place that does the same thing. I do business with -- business with dealerships. So I went and picked up my customer's truck. Had it sprayed and brought it back to my customer.

Q:   Did you have to make any expenditures to purchase new equipment?

A:   The following day, I went to the truck store, the company I went to work for, and he helped me out and sprayed my trucks for me; and then I bought a quick liner gun and started doing it that way.

Q:   I'm going to ask you to look at what's been marked as Plaintiff's Exhibit 1-U.

A:   Okay.

Q:   Is that affidavit [sic] to you put in connection with pleadings filed on your behalf of Mr. Morasch after he became involved?[15]

A:   Yes.

Q:   What are those records of?

---

[15] Plaintiff's Exhibit 1-U does not contain an affidavit.

18

A: The items that I had to re-purchase or things that I had to get.

In accordance with this testimony, the entries in the "Replacement Items" table of the exhibit include the amount paid on the day after the seizure to have another company spray a "Customer Truck," and the amounts paid two days after the seizure to have multiple trucks sprayed and to purchase a "Qwik Liner Gun."

When these expenses were incurred, Ross was no longer operating a sole proprietorship in the business of selling and applying spray-on truck-bed liners; however, Spray-On Bedliners, Ross's limited-liability company, was in that business. Thus, the expenses to "continue to conduct" such a business were Spray-On Bedliners' expenses, not damages personally sustained by Ross. Just as with Spray-On Bedliners' legal expenses, Ross incurred these expenses, if any, only because she chose to assume personal responsibility for the company's expenses, not because Saulsberry proximately caused her to incur them.[16] In light of the trial court's unchallenged finding that Saulsberry is not liable to Spray-On Bedliners, the company cannot recover its business expenses from him, and there is no basis for permitting Ross to do so.

Having eliminated the amounts awarded to Ross for Spray-On Bedliners' legal and business expenses, we turn now to the amounts awarded for Ross's own attorney's fees.

### 3. There is legally insufficient evidence that, but for Saulsberry's negligence, Ross would not have incurred the same amount of attorney's fees that Morasch charged for representing her.

To prove that Saulsberry proximately caused her to incur the attorney's fees

---

[16] The record does not show the extent to which these expenses were paid or incurred by Ross, by Spray-On Bedliners, or by someone else. For example, the invoice supporting one entry shows that the purchaser was "Whitney Smith," who paid in cash, and the receipt supporting another entry identifies the purchaser as "249 Auto Trim." Neither name appears elsewhere in the record.

she sought, Ross was required to introduce expert testimony to (a) identify what a reasonably prudent attorney would have done if the attorney had possessed the same knowledge that Saulsberry possessed at the time of the alleged malpractice, and (b) provide a causal link between that specific conduct—Saulsberry's inaction upon receiving TOFF's discovery requests—and the adverse result she obtained. *See Alexander*, 146 S.W.3d at 119–20. Ross does not complain that the walk-away agreement she ultimately reached with TOFF was an adverse result proximately caused by Saulsberry. It instead appears to be her position that, but for Saulsberry's negligence, she could have achieved the same walk-away settlement agreement without incurring attorney's fees. The record, however, contains legally insufficient evidence on which a reasonable factfinder could reach such a conclusion.

Morasch's expert testimony linking Saulsberry's negligence to the attorney's fees Ross sought as damages is as follows:

> Q. In any event, what is your opinion regarding the effect of Mr. Saulsberry's failure to communicate with [Ross] and abandonment of her without giving her an opportunity to come in and take steps to forestall the foreclosure?
>
> A. The post-judgment discovery answer. The conclusion of the litigation in this case was based on the fact that after I filed a summary judgment motion or after I counterclaim[ed] and filed a motion for summary judgment, my negotiations with Mr. Magenheim were that everybody walks away. And he was– bases that on the fact or he communicated with me that he would not have filed for the writ of execution had he known there was no money left.
>
> . . . .
>
> Q: As a result of that abandonment, what damages were caused in this case to be suffered by Wendy Ross and/or her company?

20

A: She had her property seized to retrieve some [sic] and also to replace property. She incurred legal expenses with me to defend in that action, as well as the breach of contract action.

. . . .

Q: Is this invoice a correct representation of the time you spent in the matter and calculated at the rate of billing that you indicated would be in effect with Ms. Ross?

A. Yes.

The invoice shows that Morasch billed Ross $38,850.00 for the 111 hours of work he performed while representing both her and Spray-On Bedliners.

Although Ross sought and was awarded this entire amount, there is no expert testimony that, but for Saulsberry's negligence, Ross would not have incurred fees for her legal representation. There also is no expert testimony about the amount, reasonableness, or necessity of the attorney's fees that Ross actually incurred for her own legal representation after Saulsberry's malpractice, and there is no expert testimony comparing the fees actually incurred with the fees that Ross would have incurred if Saulsberry had acted as a reasonably prudent attorney. In the absence of expert testimony explaining the causal link between Saulsberry's negligence and the attorney's fees Ross sought to recover, the assertion that such a link exists is legally insufficient as a matter of law. *See Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999) ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts.").

Morasch did not explain his conclusion that Saulsberry's malpractice proximately caused Ross to incur attorney's fees, but as we have seen, he attempted to imply causation through his testimony about remarks made by TOFF's attorney Magenheim during the settlement negotiations that culminated in

a walk-away agreement.  Morasch elaborated on that discussion as follows:

> Q.  Did you ever have a discussion with [Magenheim] about why he had executed on the judgment?
>
> A.  Yes.  He said he executed on the judgment because he could get no response from Mr. Saulsberry's office.
>
> . . . .
>
> Q.  You also said something about Mr. Magenheim saying that but for getting a response from Mr. Saulsberry.  What response was he looking for?
>
> A.  A response to the post-judgment discovery.
>
> Q.  He was just looking for a response to that discovery?
>
> A.  That's what he indicated to me, yes.
>
> . . . .
>
> Q:  You're not saying answers to that discovery will stop the seizure?
>
> A:  That's what Mr. Magenheim told me when we decided everybody would walk away, because there's nothing for his client to get if they pursued litigation.
>
> . . . .
>
> Q.  And so do you have an opinion as to whether or not had the discovery answers been served within 30 days, that would have taken the execution that finally occurred on December 8th off track?
>
> A.  For one thing, during the settlements or ultimate settlement of the lawsuit, based on the answers that I served on Mr. Magenheim, he said he would not go forward with it.

Morasch's testimony about this conversation was admitted without objection, and unobjected-to hearsay "may not be denied probative value merely because it is hearsay."  TEX. R. EVID. 802.  In accordance with the standard of review, we presume that the trial court found this evidence credible.  Nevertheless, when reviewing the legal sufficiency of the evidence, we do not "ignore fatal gaps

22

in an expert's analysis or assertions that are simply incorrect." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 912 (Tex. 2004). This evidence suffers from both defects.

A reasonable factfinder could not infer that Ross would not have incurred attorney's fees but for Saulsberry's failure to respond to TOFF's discovery requests, because on the same day that TOFF served the requests, it also filed both its notice of intent to execute and its separate breach-of-contract suit. There is no evidence that a reasonably prudent attorney could have decided to take no responsive action at all; to the contrary, Ross's legal-malpractice claim against Saulsberry is based on precisely such inaction. Thus, even in the absence of any professional negligence, Ross still would have incurred legal fees for an attorney to "take steps to forestall" the execution, to respond to discovery, and to represent her in the breach-of-contract suit. There is no evidence that the fees to represent her would have been any less.[17]

The evidence also falls short in other ways. For example, Morasch testified that Magenheim's statements were based on the discovery responses that Ross made in February 2009. According to Morasch, those discovery responses showed that Ross had no money, but the responses themselves are not in the record. Morasch admits that he does not know whether Ross had the money to purchase six additional sets of chemicals during the period from September to December 2008. We therefore do not know the extent to which the discovery responses would have been different if they had been answered earlier.

Even if a reasonable factfinder could infer that Ross's answers would have

---

[17] On this record, even the amount actually incurred for Ross's legal representation is not known. There is no testimony on the subject, and the only documentary evidence fails to distinguish between Morasch's fees for representing Ross and for representing Spray-On Bedliners.

been the same if made three months earlier, a more serious problem remains. Despite Morasch's testimony that TOFF decided to walk away from its claims based on Ross's discovery responses, no reasonable factfinder could infer that Ross's attorney's fees would have been less if she had answered the discovery sooner. This is so because, notwithstanding opposing counsel's statements during settlement negotiations, the undisputed fact is that TOFF did *not* walk away when it received discovery responses showing that Ross had no money.[18] The parties instead continued to litigate their respective claims against one another for more than seven months, and throughout that time, Ross continued to incur attorney's fees. Although there is no expert testimony to reconcile the statements of TOFF's attorney with TOFF's actions, the resolution of this incongruity is dictated by the standard of review, under which factfinders "are not free to believe testimony that is conclusively negated by undisputed facts." *See City of Keller*, 168 S.W.3d at 820.

For all of these reasons, we conclude that the evidence is legally insufficient to support Ross's recovery of attorney's fees.

## B. Fair Market Value

The remaining damage component is the amount awarded as compensation for the value of the property that was seized and sold at auction. Saulsberry argues that there is no evidence of the property's fair market value, which is the proper measure of damages. Whether the trial court applied the proper measure of

---

[18] *Cf. McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999) ("Generally, courts have acknowledged that a third party's reliance on an attorney's representation is not justified when the representation takes place in an adversarial context."); *Valls v. Johanson & Fairless, L.L.P.*, 314 S.W.3d 624, 635 (Tex. App.—Houston [14th Dist.] 2010, no pet.) ("Courts have repeatedly held a party may not justifiably rely on statements made by opposing counsel during settlement negotiations.")

damages is a question of law, which we review de novo. *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

We agree that fair market value is the proper measure of damages for the loss of personal property. *See City of Tyler v. Likes*, 962 S.W.2d 489, 496–97 (Tex. 1997); *Int'l–Great N. R.R. Co. v. Casey*, 46 S.W.2d 669, 670 (Tex. Comm'n App. 1932, holding approved). We also agree that there is no evidence of the fair market value of the seized property. Indeed, no witness even used the word "value." Ross instead relied entirely on the previously discussed exhibit, Plaintiff's Exhibit 1-U, which contains the table, "Seized Property – Sold at Auction." The table consists of three columns which are labeled "Qty," "Item," and "Value." There is no evidence in the record to explain what "Value" was intended to represent, how it was measured, or whether the determination of an item's value was made by a person qualified to do so.

In her response brief, Ross does not dispute that fair market value is the correct measure of damages. She instead argues that "[t]here was record evidence from which the trial court could discern the market value of that property and to measure [her] loss by reference to what she had to pay to replace her property and by what [TOFF] received from its forced sale." We need not address whether this would have been an appropriate method to determine fair market value, because the record does not support Ross's suggestion that it was employed here.[19]

---

[19] If lost personal property has no ascertainable market value, a plaintiff may rely on the property's replacement cost as an alternative measure of damages. *See Casey*, 46 S.W.2d at 670. First, however, the plaintiff must meet its burden to establish that an alternative measure of damages is appropriate. *See Wise Elec. Coop., Inc. v. Am. Hat Co.*, No. 02-13-00439-CV, 2015 WL 5460543, at *18, *21 (Tex. App.—Fort Worth Sept. 17, 2015, no. pet. h.) (stating the rule and holding that the plaintiff met its burden to establish that there was no market value for its damaged property, and thus, replacement value was the proper measure of damages). Ross, however, has never argued or attempted to establish that the property at issue had no ascertainable market value. *See Enzo Invs., L.P. v. White*, No. 14-13-00509-CV, 2015 WL 3524461, at *10 (Tex. App.—Houston [14th Dist.] June 4, 2015, pet. denied) (sub. op.) (holding

Contrary to her assertions, there is no evidence of the amount that TOFF received from the sale of property, and no evidence that many pieces of property were replaced. Despite the absence of such evidence, the trial court awarded damages that include as compensation for property loss the amount identified in Ross's exhibit simply as "value." Such unexplained assertions about the property's "value" are legally insufficient as a matter of law. *See Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 159 (Tex. 2012) ("[P]roperty valuations may not be based solely on a property owner's *ipse dixit*."); *Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 669 (Tex. 1996) (explaining that a property owner's testimony about the property's market value "is probative if it is based on the owner's estimate of market value and not some intrinsic or other value such as replacement cost" (citing *Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984))).

Ross also asserts that the trial court had discretion to award damages "within the range of evidence" introduced at trial. *See Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). Although the principle on which Ross relies is correct, it cannot be applied if the plaintiff "offered no evidence to furnish a range within which a [factfinder] could exercise its discretion to award damages in the first place." *Id.* at 567. Here, there is no such evidence.

## V. CONCLUSION

The evidence supports the trial court's finding that Saulsberry and Ross had an attorney–client relationship at all relevant times, and Saulsberry does not challenge the finding that he breached the duty that an attorney owes to a client. The evidence nevertheless is legally insufficient to support Ross's recovery of

---

that plaintiff who failed to present evidence of the property's fair market value at the relevant time was not entitled to alternative relief because he also failed to present evidence that the property had no ascertainable market value).

another party's attorney's fees and business expenses. The evidence also is legally insufficient to support an implied finding that, but for Saulsberry's professional negligence, Ross would not have incurred attorney's fees or would have incurred a lesser amount. Finally, the bare assertion of the "value" of the property that was seized and sold at auction is legally insufficient to support an award of damages.

We accordingly sever the portions of the judgment that were not challenged on appeal,[20] reverse the remainder of the judgment in Ross's favor; and render judgment that Ross take nothing.


/s/    Tracy Christopher
Justice


Panel consists of Justices Christopher, Brown, and Wise.

---

[20] Specifically, we sever the portions of the judgment (a) ordering that Spray-On Bedliners take nothing by its claims against Saulsberry; (b) holding Ross liable to Saulsberry for a total of $10,162.70; and (c) ruling that post-judgment interest will accrue at the rate of 5% per annum from September 2, 2014 until paid.