**Affirmed and Memorandum Opinion filed April 19, 2016.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-15-00027-CV

---

### GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS; AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS, Appellants

### V.

### CHECKFREE SERVICES CORPORATION, Appellee

---

**On Appeal from the 53rd District Court
Travis County, Texas
Trial Court Cause No. D-1-GN-13-003667**

---

## M E M O R A N D U M   O P I N I O N

CheckFree Services Corporation contracted with several banks to provide bill pay services through these banks' on-line banking services to the banks' customers. An auditor from the Texas State Comptroller determined that CheckFree should have collected sales tax on its sales of these services to the banks. CheckFree tendered partial payment of assessed sales taxes and interest.

Following the conclusion of administrative proceedings that affirmed the auditor's determination and denied CheckFree's refund claim, CheckFree filed suit against the Comptroller and the Texas State Attorney General (collectively, the Comptroller) seeking a refund.

After a bench trial, the trial court signed a judgment in favor of CheckFree, awarding it a refund of the taxes it paid, plus interest. In a single issue, the Comptroller asserts that the trial court erred in concluding that the services CheckFree provided to the banks were not taxable data processing services.

## I. Background

The underlying dispute arises from CheckFree's refund claim for $3 million paid in sales taxes on the sale of its bill pay services to three banks during the tax period from June 1, 2005 through July 31, 2008. An auditor determined that, during this period, CheckFree had engaged in taxable "data processing services"; CheckFree paid the $3 million following the audit. CheckFree challenged the auditor's determination through administrative proceedings, but was unsuccessful. It then filed suit against the Comptroller, seeking a refund of the $3 million it had paid.

The parties filed pre-trial briefing, and the trial court conducted a two-day bench trial. After the bench trial, the trial court signed a judgment in favor of CheckFree ordering the Comptroller to refund CheckFree the $3 million in sales and use tax it had paid and awarding CheckFree statutory interest. The court signed detailed findings of fact and conclusions of law. Based on these findings, the trial court made numerous legal conclusions that the transactions at issue in this case were "bill pay services" that were not taxable "data processing services" as defined either by the Texas Tax Code or the Comptroller's administrative rules. The Comptroller timely noticed its appeal of the trial court's judgment.

## II. Standards of Review[1]

Findings of fact entered in a case tried to the court are entitled to the same force and dignity as a jury's verdict on jury questions. *McNeil Interests, Inc. v. Quisenberry*, 407 S.W.3d 381, 386 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)). "Where, as here, a case is tried without a jury and the trial court issues findings of fact, the reviewing court is bound by any unchallenged finding unless the evidence is legally insufficient to support it." *Saulsberry v. Ross*, No. 14-14-00798-CV, –S.W.3d–, 2015 WL 6692271, at *3 (Tex. App.—Houston [14th Dist.] Nov. 3, 2015, no pet.) (citing *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014)); *see City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex. 2005) (describing legal sufficiency standard of review). We review a trial court's conclusions of law drawn from the facts de novo to determine their correctness. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

Further, the Comptroller's issue concerns statutory construction, a question of law that we review de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008). Our primary concern in construing a statute is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). "We thus construe the text according to its plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (citing *City of Rockwall v. Hughes*, 246

---

[1] This case was transferred to our court from the Third Court of Appeals by order of the Supreme Court of Texas. Therefore, we must decide the case in accordance with the Third Court's precedent if our decision would be otherwise inconsistent with its precedent. *See* Tex. R. App. P. 41.3.

S.W.3d 621, 625–26 (Tex. 2008)).  We "'read the statute as a whole and interpret it to give effect to every part.'"  *Railroad Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) (quoting *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003)).

We construe administrative rules, which have the same force and effect as statutes, in the same manner as statutes.  *Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999).  Unambiguous comptroller rules must be construed in accordance with their plain language.  *See Cirrus Exploration Co. v. Combs*, 427 S.W.3d 464, 471 (Tex. App.—Austin 2014, pet. denied).  Finally, "[t]axing statutes are construed strictly against the taxing authority and liberally for the taxpayer."  *See Morris v. Houston Indep. Sch. Dist.*, 388 S.W.3d 310, 313 (Tex. 2012).

### III.  Applicable Law

Although the Comptroller has been granted exclusive jurisdiction to interpret what "taxable services," including "data processing services," means,[2] the Comptroller may not interpret this term in a manner contrary to the tax code.  *See, e.g.*, *Combs v. Home & Garden Party, Ltd.*, No. 03-09-00673-CV, 2010 WL 4367054, at *5 (Tex. App.—Austin Nov. 3, 2010, no pet.) (mem. op.) (citing *DuPont Photomasks, Inc. v. Strayhorn*, 219 S.W.3d 414, 419 (Tex. App.—Austin 2006, pet. denied)).  Through section 151.0035 of the Texas Tax Code, the Legislature has provided examples of what the term "data processing service" includes:

> "Data processing service" includes word processing, data entry, data retrieval, data search, information compilation, payroll and business accounting data production, . . . and other computerized data and

---

[2] *See* Tex. Tax Code § 151.0101(b).

5

information storage or manipulation. "Data processing service" also includes the use of a computer or computer time for data processing whether the processing is performed by the provider of the computer or computer time or by the purchaser or other beneficiary of the service. . . .

Tex. Tax. Code § 151.0035.

As part of its role to interpret what may be taxed as "data processing services" under the Code, the Comptroller has enacted Rule 3.330(a)(1) to define what "data processing services" are. *See* 34 Tex. Admin. Code § 3.330(a)(1). This subsection provides in pertinent part:

> Data processing services--the processing of information for the purpose of compiling and producing records of transactions, maintaining information, and entering and retrieving information. It specifically includes word processing, payroll and business accounting, and computerized data and information storage or manipulation. The charge for data processing services is taxable regardless of the ownership of the computer. Examples of data processing services include entering inventory control data for a company, maintaining records of employee work time, filing payroll tax returns, preparing W-2 forms, and computing and preparing payroll checks.

*Id.* The Comptroller has also defined what "data processing services" are not:

> Data processing does not include the use of a computer by a provider of other services when the computer is used to facilitate the performance of the service or the application of the knowledge of the physical sciences, accounting principles, and tax laws, e.g., the use of a computer to provide interpretive or enhancement geophysical services or the use of a computer by a CPA firm, enrolled agent, or bookkeeping firm to produce a financial report, prepare federal income tax, state franchise or sales tax returns, or charges for temporary secretarial personnel who as part of their function use word processing equipment.

*Id.*

With the appropriate standard of review and applicable law in mind, we turn to the Comptroller's sole issue: whether the trial court erred in determining that the services that CheckFree provided were not taxable data processing services under the Texas Tax Code and the Comptroller's administrative rules.

## IV. Discussion

As the plaintiff in a tax-refund case, CheckFree had the burden of proving, by a preponderance of the evidence, that it is entitled to a refund of the sales tax it paid on the services it provided to the banks because those services were not subject to a tax. *See Roark Amusement & Vending, L.P. v. Combs*, No. 03-10-00105-CV, 2011 WL 255535, at *2 (Tex. App.—Austin Jan. 26, 2011) (mem. op.), aff'd, *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632 (Tex. 2013); *GATX Terminals Corp. v. Rylander*, 78 S.W.3d 630, 634 (Tex. App.—Austin 2002, no pet.).

In an effort to meet this burden, CheckFree presented two witnesses: Russell Kohl, the senior vice president of tax and treasury of CheckFree's parent company, Fiserv Corporation, and Mary Beth Lawson, the vice president of product management for Fiserv.[3] Both Kohl and Lawson testified live and via excerpts from depositions that were read into the trial transcript.

Kohl and Lawson described CheckFree's services, largely focusing on three types of activities that CheckFree provides to the banks: (1) the electronic delivery platform that CheckFree used to facilitate the performance of the bill pay service provided to the bank's customers, (2) the actual bill pay service, and (3) other aspects of the transactions, such as invoices, reports, and customer service that were provided to the banks and the bank's customers. Lawson explained that the

---

[3] During the majority of the time of the audit, Lawson was the director of platform services for CheckFree.

7

technology platform through which the bill pay services operated was neither sold nor licensed to the banks.

Pursuant to agreements with the banks, CheckFree provided an electronic bill pay service to the bank's customers (the users). The banks were responsible for obtaining user authorizations to enroll in the bill pay services. By means of the bill pay service, the users could initiate and authorize payments from their accounts to selected payees. The users were approved and enrolled by CheckFree, and CheckFree conducted a "soft credit check" on the users. CheckFree agreed to execute the delivery of all payments as instructed by the users, except in certain cases such as when users provided incorrect instructions or had insufficient funds. CheckFree determined the method of payment, generally using the Automated Clearing House (ACH) to debit the users' accounts and credit the payees' accounts, but in about twenty percent of the cases, CheckFree provided paper checks to payees.

CheckFree provided the banks with a dedicated connection that was owned and operated by CheckFree. CheckFree monitored and supported the network hardware, software, and mainframe operations. CheckFree employed thousands of professionals who monitored transactions to prevent fraud and to ensure compliance with banking regulations. CheckFree also provided professional support directly to the banks' users in cases where payments were not made as instructed. CheckFree prepared numerous reports for the banks, containing detailed information regarding the users and payments that were processed during the report periods.

By linking to CheckFree's system through the banks' online banking portals, users could receive bill summaries from some payees and schedule payments. For other payees, users entered payment data, including payee information, payment

amounts, and payment due dates into CheckFree's system. Once admitted to a user interface, users could access CheckFree's portal to add payees, make payments, view pending payments, and perform other tasks related to bill payment. CheckFree retained the users' billing and payment data for retrieval by the users for ninety days. CheckFree retained the data pursuant to banking regulations for seven years.

The contracts with each of the banks were entitled "CheckFree Services Corporation Electronic Commerce Service Agreement" and were very similar, although the type of services provided by CheckFree varied slightly for each bank. For example, two of the banks entered into agreements with CheckFree for implementation of CheckFree's electronic commerce system to access only CheckFree's electronic bill payment service, but the third bank opted to implement CheckFree's electronic commerce system to access CheckFree's electronic bill payment service as well as CheckFree's electronic banking services. Services to the banks for which taxes were assessed included invoiced charges for monthly infrastructure fees; fees for paper and electronic transactions; processing charges for new subscriber set-ups; processing charges for non-sufficient funds, stop payments, and claims; subscriber fees for active and inactive users; subscriber fees for banking and bill pay; monthly minimum charges; service hosting fees; processing charges for telecommunications minutes and VPN lines; and transaction fees for excess payments and excess sessions.

Based upon this evidence, the trial court's findings and conclusions properly focused on the "essence of the transaction" at issue, rather than simply the involvement of a computer, to determine the nature of the services CheckFree provided. *Cf. Roark Amusement & Vending*, 422 S.W.3d at 637 & n.14 (explaining that the "economic realities underlying the transactions in issue"

9

should not be disregarded in determining the plain meaning of taxing statutes and noting the long-standing tradition of focusing on the "essence" or "object" of a transaction to determine whether a tax is due). In accord with the Comptroller's rule, the trial court was required to determine whether CheckFree does something more than "compiling and producing records of transactions, maintaining information, and entering and retrieving information," such as providing physical science, legal, or accounting services based on the information—i.e., providing professional services that are facilitated by the use of a computer. *See id.*

Here, in addition to the numerous findings describing the general nature of CheckFree's services, the trial court made the following unchallenged finding: "CheckFree has thousands of skilled and/or certified professionals who collaborate in the performance of these professional services centered around bill payment." The finding is supported by the testimony of Lawson and Kohl regarding the role of the professionals employed by CheckFree:

- Bill pay service is a professional service requiring accredited or certified professionals across several areas including ACH processing, financial crime investigation, treasury, anti-money laundering, and accounting.

- CheckFree employs over 3,000 associates and professionals necessary to facilitate the bill pay service.

- These professionals manage the actual bill pay process and make decisions at multiple stages of the bill pay process.

- These professionals are responsible for critical monitoring and detection of fraud, money laundering, and other financial risks.

- These professionals are also responsible for compliance with complex government regulations.

10

- A team deals with errors and other customer service issues that arise after bill payment occurs.

- These professionals are not a minor part of the bill pay service delivery; instead, they are the "secret sauce" of the service.

Because this evidence supports the trial court's finding, we are bound by it. *See Saulsberry*, 2015 WL 6692271, at *3 (explaining that we are bound by unchallenged fact finding unless the evidence is legally insufficient to support it).

The Comptroller also has not challenged the following findings by the trial court:

> The delivery platform for the bill pay service, the Electronic Commerce System, also called the Genesis System, and other technology including software and equipment used to facilitate the performance of the bill pay service is not the service that CheckFree sells to the financial institutions. Rather, the technology and equipment are part of the delivery platform for the service, or the inputs that produce the service, but they are not the service.
>
> ***
>
> Lawson and Kohl explained the distinction between bill pay and data processing: the activities the Comptroller labels as data processing are actually incidental activities facilitating the delivery of bill pay services and are not the actual service.
>
> The functions or activities that are incidental to the bill pay service, such as, invoices, reports, and customer service, are not the service that CheckFree sells to the financial institutions.

These findings are likewise supported by legally sufficient evidence; thus we are bound by them. *See id.*

Additionally, none of the transactions for which CheckFree was audited and paid taxes fall clearly within the activities enumerated in either the applicable statute or agency rule. In other words, none of the services CheckFree was audited

11

and paid taxes for consist of "the processing of information *for the purpose of* compiling and producing records of transactions, maintaining information, [or] entering and retrieving information." 34 Tex. Admin. Code § 3.330(a)(1) (emphasis added). Nor do any of these services consist of "word processing, data entry, data retrieval, data search, information compilation, payroll and business accounting data production, . . . [or] other computerized data and information storage or manipulation." Tex. Tax Code § 151.0035. To the contrary, the trial court's findings, excerpted above, establish that, to the extent that CheckFree provided any of these services, they were ancillary to the professional bill pay services provided by CheckFree for the bank's customers–the electronic commerce services that the bank purchased from CheckFree. *See Roark Amusement & Vending*, 422 S.W.3d at 637–38 (focusing on "economic realities" underlying transaction to determine whether tax was due).

The Comptroller would have us ignore the trial court's factual findings in this case and conclude that, because the users of the bill pay service input data into CheckFree's system, which CheckFree relied on to ultimately pay their bills, CheckFree was selling taxable data processing services to the banks. But we may not simply ignore the trial court's findings; they are entitled to the same force and dignity as a jury's verdict. *See McNeil Interests*, 407 S.W.3d at 386. Despite our de novo review of the statute and agency rule at issue here, we nonetheless must defer to the trial court's unchallenged fact findings regarding the nature of the activities in this case. And these findings, detailed above, establish that CheckFree provides a professional service—facilitated by the use of computers and an electronic commerce system—that requires the oversight and management of thousands of certified specialists to achieve the goal of paying the bills of the banks' customers.

12

In sum, we must strictly construe taxing statutes against the Comptroller and liberally in favor of CheckFree. *See Morris*, 388 S.W.3d at 313. Under these circumstances, we determine that the trial court's unchallenged findings support the trial court's conclusion that CheckFree's services do not fall within the Comptroller's definition of data processing services because that definition specifically excludes providers of other professional services who use a computer to facilitate the performance of their services. *See* 34 Tex. Admin. Code § 3.330(a)(1); Tex. Tax Code § 151.0101(b) (providing the Comptroller with exclusive jurisdiction to interpret what taxable services, including data processing services, means); *see also* Tex. Tax. Code § 151.0035 (providing examples of "data processing service").

For the foregoing reasons, we overrule the Comptroller's sole issue on appeal.

## V. Conclusion

We have overruled the Comptroller's single appellate issue. The judgment of the trial court is affirmed.

/s/    Sharon McCally
       Justice

Panel consists of Justices Jamison, McCally, and Wise.