**Affirmed and Plurality, Concurring, and Dissenting Opinions filed December 31, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-12-00685-CV

---

### HIGHTOWER, RUSSO & CAPELLAN, Appellant

### V.

### IRESON, WEIZEL & HIGHTOWER, P.C., Appellee

---

**On Appeal from the 80th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2010-80230**

---

## P L U R A L I T Y   O P I N I O N

Appellant, Hightower, Russo & Capellan ("the Hightower firm"), appeals a judgment apportioning attorney's fees among that firm and appellee, Ireson, Weizel & Hightower, P.C. ("the Ireson firm") for their representation of a plaintiff in an underlying claim. The judgment is affirmed.

### I. BACKGROUND

Timothy Hightower was previously a partner, and Alexandra Mutchler was

an associate, with the Ireson firm. During their employment, the Ireson firm began representing a plaintiff ("client") in a suit for personal injuries sustained in an automobile accident during the scope of his employment. The representation was pursuant to a contingency fee contract, under which attorney's fees and expenses would be paid from any recovery.

On August 22, 2011, Hightower resigned from the Ireson firm and created the Hightower firm. Mutchler became associated with the Hightower firm. On August 31, 2011, client signed a document stating as follows:

Re: TRANSFER OF CASE TO [THE HIGHTOWER FIRM]

To whom it may concern:

I, [client], understand that Timothy R. Hightower, Ivan Capellan are leaving, or have left, the firm of [the Ireson firm], and starting, or joining another firm, [the Hightower firm] (incorporation status is pending and a new name or different name does not change this agreement, as long as Timothy R. Hightower is a partner). I hereby request that my case be transferred to [the Hightower firm] and/or Timothy R. Hightower and/or Ivan Capellan and that Timothy R. Hightower and/or Ivan Capellan is hereby authorized to act, and is appointed by me, as my sole legal counsel and representative. I request that all original file materials, in any form (computer stored, hard copied, etc.) be given to Timothy R. Hightower. I hereby terminate my attorney client relationship with [the Ireson firm].

I understand the terms of my contract shall continue with both the new firm and old the firm [sic], [the Ireson firm] and hereby authorize the new firm to justly, equitably and fairly apportion all legal fees received and expenses paid consistent with the State Bar Rules. However, I shall never be obligated to pay a greater attorney fee or expense other than what is in the original contract.

This document was not signed by the Hightower firm, and there was no separate contract between client and the Hightower firm regarding attorney's fees. Additionally, the document was not signed by the Ireson firm. The record does not

otherwise contain any evidence demonstrating the Ireson firm agreed to the statement authorizing the Hightower firm "to justly, equitably and fairly apportion all legal fees received and expenses paid consistent with the State Bar Rules." The record contains no agreement, written or otherwise, between the Hightower firm and the Ireson firm regarding apportionment of fees earned on client's case.

There were originally three defendants in client's suit: (1) the other driver, who was insured under a liability policy[1]; (2) client's own uninsured/underinsured ("um") carrier; and (3) the um carrier for client's employer. The employer's worker's compensation carrier, who had paid benefits to client, also became involved in settlement negotiations because client wished to obtain the carrier's reduction of its lien on any settlement funds.

Shortly before client signed the above transfer request, the other driver's carrier and employer's um carrier tendered their policy limits of $25,080 and $100,000, respectively. These tenders were formally accepted shortly after the transfer. At mediation approximately two and a half months after the transfer, client's um carrier agreed to pay $43,500 of its $50,000 policy limits. Acceptance of this offer was contingent on resolution of the worker's compensation lien.

Before the transfer, the worker's compensation carrier offered to reduce its lien from $87,479.22 to $57,418.57, but the offer was not accepted at that time. After the mediation, client sued the worker's compensation carrier, alleging it committed fraud by breaching an agreement to appear at the mediation. In January 2012, the worker's compensation carrier agreed to reduce its lien (which had

---

[1] The record varied on whether she was the other driver or merely the owner of the other car. That distinction is immaterial to this appeal, so this opinion will refer to her as "the other driver."

3

increased slightly due to interim additional medical bills) to $50,000—a further reduction of approximately $9,000 from the offer made before the transfer.

Client received his proceeds of the settlement, and the lien was paid and released. The attorney's fees due from the settlement totaled $56,928.15, and the expenses totaled $4,723.69.[2] The Ireson firm intervened in the suit, requesting its contingency fee interest in the settlement funds. The two firms agreed on apportionment of the expenses, leaving only a dispute over apportionment of the attorney's fees. Because of the dispute, the defendants to the underlying claim deposited a portion of the total fees and expenses into the registry of the court, and the Hightower firm held the remainder in its trust account.

The trial court conducted a bench trial. After hearing evidence, the trial court orally announced it would apportion the fees in the manner requested by the Ireson firm: $49,482 to the Ireson firm; and $7,446.15 to the Hightower firm. The Hightower firm filed a motion to reconsider, which the trial court denied by written order after a hearing. On July 19, 2012, the trial court signed an amended final judgment, apportioning the attorney's fees in amounts consistent with its oral announcement at the close of trial. Based on this allocation and the parties' agreement regarding apportionment of expenses, the trial court (1) awarded the Ireson firm $52,238.88 to be paid from the funds deposited into the registry of the court and a portion of the funds held in trust by the Hightower firm, and (2) awarded the Hightower firm $9,412.96, to be paid from the funds it held in trust.[3]

---

[2] According to the Hightower firm, after the settlements, the firm and client (1) agreed to reduce the contingency fee from 40%, as prescribed in the contract between client and the Ireson firm, to 33.77%, and (2) agreed to the amount of expenses payable from the settlement funds. The Ireson firm does not challenge these agreements or dispute the above-mentioned total fees (33.77% of the recovery) and expenses were the correct amounts due from the settlement funds.

[3] The court amended its original final judgment to add a requirement that the district clerk's check to the Ireson firm from the funds in the registry of the court include interest.

4

The Hightower firm filed a motion for new trial, which was denied by written order. Additionally, the trial court issued written findings of fact and conclusions of law. The Hightower firm now appeals.

## II. ANALYSIS

In its two stated issues, the Hightower firm asserts the trial court (1) applied an illegal methodology to apportion the fees, and (2) erred by awarding "89%" of the total fees to the Ireson firm when it performed, at most, 50% of the work.

### A. Basis for the Trial Court's Ruling

Preliminarily, an issue must be addressed regarding the basis for the trial court's ruling.

After hearing evidence at the bench trial, the trial court orally remarked it would apply Texas Government Code section 82.065, which provides, "A contingent fee contract for legal services must be in writing and signed by the attorney and client." Tex. Gov't Code Ann. § 82.065(a) (West 2013). The trial court remarked the Hightower firm was not entitled to any portion of the fees because it had no valid contract with client but the court would award $7,446.15 to the Hightower firm because the Ireson firm consented. In its motion to reconsider, the Hightower firm argued that section 82.065 is inapplicable. After hearing arguments, the trial court orally ruled it was denying the motion and would render judgment in accordance with its previous oral announcement.

After the trial court signed its amended judgment, it issued a writing entitled "Findings of Fact and Conclusions of Law," containing eleven items. However, the trial court did not separate these items according to whether they were findings of fact or conclusions of law. We construe the items more as findings of fact than conclusions of law. Nos. 1 through 8 are factual recitations regarding the

5

background of the dispute.  Nos. 9, 10, and 11 are the findings that seem pertinent to the basis for the trial court's ruling:

> 9.　　[Client] did not enter into a written contingency fee agreement with [the Hightower firm].
>
> 10.　　There is no evidence of a written consent in compliance with Texas Disciplinary Rule No. 1.04(f) that was signed by [client] and both law firms for the division of fees between lawyers who are not in the same firm.
>
> 11.　　The reasonable value of legal services provided to [client] by [the Hightower firm] is $7,446.15.

The trial court did not expressly make any conclusions of law to correspond with one or more of these findings and provide the legal basis for the court's ruling.  If read in isolation, each particular finding implicitly indicates a legal basis for the trial court's ruling.  However, when read together, the implicit legal conclusions are inconsistent.  No. 9 indicates the trial court concluded that, under Government Code section 82.065, the Hightower firm was not entitled to any portion of the fees because it had no written contingency fee agreement with client, although the finding did not specifically mention section 82.065.  No. 10 indicates the trial court concluded that, even if there were such an agreement, the Hightower firm was precluded from sharing in the fees because there was no consent to division of fees complying with Disciplinary Rule 1.04(f).[4]  Then, No. 11 indicates

---

[4] Rule 1.04(f) provides,

(f) A division or arrangement for division of a fee between lawyers who are not in the same firm may be made only if:

　(1) the division is:

　　(i) in proportion to the professional services performed by each lawyer; or

　　(ii) made between lawyers who assume joint responsibility for the representation; and

6

the trial court concluded that determining the reasonable value of the services performed by each firm was the proper method for apportioning fees; this conclusion is inconsistent with Nos. 9 and 10 indicating the Hightower firm was not entitled to any share of the fees unless the Ireson firm consented.

Regardless, if the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). It follows that the judgment may be upheld although the trial court made no express conclusions of law if the court rendered the proper judgment. Further, an incorrect conclusion of law will not require reversal if alternate findings of fact and conclusions of law provide a valid, alternative basis for the judgment. *See Stephens v. Beckham & Jones Co.*, No. 11-00011-CV, 2013 WL 364228, at *3 (Tex. App.—Eastland Jan. 31, 2013, no pet.) (mem. op.); *In re J.J.L.-P.*, 256 S.W.3d 363, 376 (Tex. App.—San Antonio 2008, no pet.). Therefore, the judgment may be upheld if any one of the trial court's

---

(2) the client consents in writing to the terms of the arrangement prior to the time of the association or referral proposed, including:

    (i) the identity of all lawyers or law firms who will participate in the fee-sharing agreement, and

    (ii) whether fees will be divided based on the proportion of services performed or by lawyers agreeing to assume joint responsibility for the representation, and

    (iii) the share of the fee that each lawyer or law firm will receive or, if the division is based on the proportion of services performed, the basis on which the division will be made; and

(3) the aggregate fee does not violate paragraph (a) [which prohibits illegal or unconscionable fees].

Tex. Disciplinary Rules of Prof'l Conduct R. 1.04(f*), reprinted in* Tex. Gov't. Code Ann., tit. 2, subtit. G, app. A (West 2013) (Tex. State Bar R. art. X, § 9).

findings of fact and implicit conclusions of law provides a valid basis for the judgment.

In this regard, the Hightower firm suggests Government Code section 82.065 is inapplicable to the present case although it also asserts the trial court abandoned that provision before rendering judgment. Further, the Hightower firm argues the trial court erred by applying Disciplinary Rule 1.04(f).[5] However, both parties seem to agree that determining the reasonable value of the services provided to client by each firm is the proper method for apportioning the fees although they disagree on the proper apportionment under this method. As discussed below, the evidence is legally and factually sufficient to support Finding No. 11. Accordingly, it is not necessary to decide whether the trial court erred by applying Government Code section 82.065 or Disciplinary Rule 1.04(f). This opinion will assume, without deciding, that the trial court correctly concluded (1) the Hightower firm is entitled to a portion of the fees, and (2) calculating the reasonable value of services provided by each firm is the proper legal method for apportioning the fees.

## B.   Finding on the Reasonable Value of the Services

When challenging the trial court's apportionment of the fees, the Hightower firm presents two interrelated contentions: (1) the trial court applied "illegal" and "contradictory" methods to determine the reasonable value of each firm's services by adopting the Ireson firm's proposed apportionment, and (2) the evidence is legally and factually insufficient to support the apportionment.

---

[5] Appellant suggests (1) Rule 1.04(f) applies only to a situation in which a firm seeks a referral fee, (2) the rule contains no requirement that the law firms sign the consent to a division of fees, and (3) the Ireson firm did not raise the rule at trial and instead first mentioned this theory in its proposed findings of fact and conclusions of law.

8

## 1.     Standard of Review

In a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). An appellate court reviews sufficiency of the evidence to support the findings under the same standards applicable to review of a jury's verdict. *Id.*

When examining a legal-sufficiency challenge, an appellate court reviews the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). The court credits favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 827. The evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the verdict under review. *Id.* The court may sustain a legal-sufficiency challenge only when (1) there is a complete absence of a vital fact, (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. The fact finder is the sole judge of witness credibility and the weight to give their testimony. *Id.* at 819.

To evaluate factual sufficiency of the evidence, an appellate court considers and weighs all the evidence and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

## 2. Trial Court's Method for the Apportionment

At trial, the Ireson firm argued the evidence supported its proposed apportionment of fees as follows:

- The settlements totaling $125,080 (from the other driver and the employer's um carrier) were tendered before transfer of the case; thus, the Ireson firm performed all services, and was entitled to all fees, associated with those settlements:  33.77% of $125,080 = **$42,240**.[6]

- The settlement of $43,500 (from client's um carrier) was tendered after the transfer; but the Ireson firm performed 70% of the services, and was entitled to the fee associated with 70% of that settlement:  33.77% of 70% of $43,500 = **$10,283**.

- The worker's compensation carrier, which had agreed to a substantial reduction of its lien before the transfer, agreed to an additional reduction of $9,000 after the transfer, increasing the client's net; thus, the Hightower firm should be credited with 33.77% of  $9,000 = **$3,039**.

- These calculations result in **$49,482** to the Ireson firm (**$42,240 + $10,283** - **$3,039**), and the remaining **$7,446.15** to the Hightower firm.

With respect to the fees associated with the settlements totaling $125,080, the Hightower firm contends the trial court applied an "illegal present value methodology," forbidden by the Supreme Court of Texas in *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557 (Tex. 2006).  Then, with respect to the fees associated with the settlement of $43,500, the Hightower firm contends the trial court applied a "contradictory" method.  According to the Hightower firm, the trial court apportioned this part of the fee based on the amount of work performed by each firm toward procuring the settlement which is inconsistent with apportioning the rest of the fee using the "present value method."

---

[6] Some of the totals proposed by the Ireson firm involve minor rounding from the exact calculations, and the figures recited herein are those proposed by the Ireson firm.

As argued by the Ireson firm, *Hoover Slovacek* is wholly inapplicable to the present case. In *Hoover Slovacek*, the client hired a law firm on a contingency fee basis to prosecute the client's claims. *Id.* at 559. The contingency fee contract included a provision stating that, in the event the firm were discharged before completing the representation, the client must immediately pay the firm "the then present value of the Contingent Fee . . . ." *Id.* The client discharged the firm before one of the client's claims was resolved and retained another firm. *Id.* at 560. At the time of the discharge, the defendant had offered to settle the client's claim for $6,000,000, but the new firm ultimately settled the claim for $900,000. *Id.* Pursuant to the above-cited provision in the fee contract, the discharged firm billed the client $1.7 million (the contingency fee percentage of $6,000,000.). *Id.* The Supreme Court of Texas held that the provision was unconscionable and therefore unenforceable. *See id.* at 565.

That case concerned solely a dispute between the client and the discharged firm regarding whether the "present value" provision in its fee agreement was unconscionable. The court's reasoning focused on the ethical duties owed by an attorney to his client and the potential pitfalls to the client from enforcement of the provision. *See id.* at 560–66. For instance, enforcement of the provision would have resulted in the firm being paid a fee that did not depend on when and whether the client ultimately recovered and a fee that exceeded the client's recovery. *See id.* at 563. In contrast, there is no dispute in the present case between client and either firm regarding the fee charged to client. The Ireson firm did not attempt to collect a fee from client equaling a percentage of the present value of the case at the time of the transfer. The fee actually charged to client was an agreed percentage of the total settlement. Instead, the present case is a dispute between

11

the Ireson firm and the Hightower firm regarding the apportionment of that fee between both firms.

The Hightower firm cites no authority extending *Hoover Slovacek* to such a dispute. Nonetheless, the trial court did not apply any present value method by adopting the Ireson firm's proposal; i.e., the court did not award the Ireson firm the entire 33.77% of $125,080 merely because an offer to settle for that amount had been made at the time of the file transfer. Rather, the actual, ultimate settlement included the $125,080. The significance of the fact the $125,080 had been tendered at the time of the transfer is that the trial court consequently concluded the Ireson firm was 100% responsible for procuring that portion of the settlement and awarded it all of the associated fees.

The Hightower firm is incorrect that the trial court then applied a "contradictory" method with respect to the $43,500 portion of the settlement. Unlike the settlements totaling $125,080, the $43,500 settlement was tendered after the transfer and after the Hightower firm performed additional work. Therefore, the Ireson firm was not 100% responsible for procuring that settlement. Thus, the trial court determined that the Ireson firm contributed 70% of the work necessary to procure that settlement and awarded it 70% of the associated fee.

The Hightower firm argues the trial court was required to apportion the total fee according to the amount of work performed by each firm on the entire case. The Hightower firm contends that under such method, the evidence conclusively establishes the total fee should be split 50/50. The Hightower firm relies on (1) the testimony of Mutchler, the associate who worked on the case for each firm, opining that 50% of the work was performed before the transfer and 50% after the transfer, and (2) a timeline presented at trial by the Hightower firm listing tasks

12

performed on the case, with a relatively equal number of entries before and after the transfer.

Assuming without deciding that the trial court, as sole judge of witness credibility, believed Mutchler's testimony, the Hightower firm offers no authority that the trial court was required to apportion the total fee according to the amount of work performed by each firm on the entire case. Additionally, the Hightower firm cites no evidence establishing such a method was the only proper manner in which to determine the "reasonable value of legal services provided to [client]" by each firm. To the contrary, the evidence supports an implicit finding that adopting the Ireson firm's proposal was a proper method for determining the "reasonable value of legal services provided to [client]" by each firm.

Specifically, it is undisputed the total fee was not based on the amount of work necessary to prosecute client's case; instead, it was a contingency fee set by contract as a defined percentage of client's total recovery. Thus, the trial court rationally concluded the reasonable value of each firm's services to client should be calculated by applying the defined percentage to the portion of the settlement funds attributable to each firm's work; i.e, if supported by the evidence, the Ireson firm was (1) 100% responsible for the settlements totaling $125,080 and entitled to the entire 33.77% of those funds, and (2) 70% responsible for the $43,500 settlement and entitled to 33.77% of 70% of those funds; and the Hightower firm was 30% responsible for the $43,500 settlement and entitled to 33.77% of 30% of those funds—plus the credit for further reducing the worker's compensation lien after the transfer).

Further, the evidence supports a finding that adopting the Hightower firm's proposal was not a proper method for determining the "reasonable value of legal services provided to [client]" by each firm. First, the evidence negates that each

13

firm was responsible for procuring 50% of the total settlement. Accordingly, splitting the fee 50/50 simply because each firm performed an equal amount of work would not constitute an apportionment based on the reasonable value of each firm's services **to client**. In contrast, adopting the Ireson firm's proposal ensures that each firm's share corresponds with the extent to which its services benefitted client.

Second, because the fee contract was undisputedly a contingency agreement, the Ireson firm, when it accepted the case, had an expectation of receiving a defined percentage of the total recovery—not a fee based on the amount of work it performed. In other words, the Ireson firm bargained for a fee based on the results obtained for client by the firm's efforts. It is a rational inference that the Ireson firm expended its best efforts to obtain a maximum result for client. As discussed below, the evidence supports a finding the Ireson firm's efforts contributed to a substantial portion of the settlement funds recovered by the client. Then, it is also undisputed client chose to discharge the Ireson firm without cause. Consequently, splitting the total fee 50/50 simply because the Hightower firm performed an equal amount of work after the involuntary discharge would, in effect, (1) not only retroactively convert the Ireson firm's fee from a contingency fee into one based on the amount of work performed, (2) but also award the Ireson firm significantly less than the fee it bargained for and earned—the defined percentage of the settlement funds procured by its efforts.[7]

By the same token, assuming without deciding the Hightower firm had a contract with client, it was a contingency fee arrangement—again a fee based on

---

[7] The Ireson firm bargained for a defined percentage of the total recovery, as though it would complete the representation. However, the Ireson firm concedes that, because of the premature discharge, it is limited to the defined percentage of the settlement funds procured by its efforts. Accordingly, its "bargain" was at least the defined percentage of the settlement funds procured by its efforts.

the result obtained for client. A 50/50 split would effectively transform this arrangement from a contingency fee into one based on the amount of work performed and give the Hightower firm a larger fee than one consistent with the result it obtained for client. Additionally, it is a rational inference that by representing client on a contingency fee basis, the Hightower firm assumed a risk its fee would be disproportionate to the amount of its work necessary to prosecute the case. Accordingly, it is reasonable that the Hightower firm's share of the fees is limited to the defined percentage of the settlement funds procured by its efforts (plus the credit) even if that formula yields a lower amount than a share based on the amount of work performed.

Accordingly, the Hightower firm fails to demonstrate the trial court applied an improper method to apportion the total fee.

### 3. Sufficiency of the Evidence

The Hightower firm also suggests that, even under the method applied by the trial court, the evidence is insufficient to support its finding regarding the reasonable value of the services performed by each firm.

#### *Settlements totaling $125,080*

The Hightower firm apparently contends the Ireson firm should not be deemed 100% responsible for procuring the settlements totaling $125,080. The Hightower firm advances one argument to support this contention: acceptance of the $125,080 was contingent on resolution of the worker's compensation lien. At trial, the Hightower firm emphasized that it could not simply accept the "low hanging fruit" of those offers without also resolving the lien because (1) the firm was obligated to obtain the optimal net for the client, and (2) the employer's um carrier (which had tendered the $100,000) was also the worker's compensation

15

carrier, albeit a different branch; thus, the Hightower firm needed leverage when requesting that the um branch persuade the worker's compensation branch to reduce the lien. According to the Hightower firm, the Ireson firm allowed the Hightower firm to "suffer through" attempting to resolve the lien and then "swooped in" to claim all fees associated with the $125,080 settlements.

However, the tenders totaling $125,080 were accepted **before** the worker's compensation lien was resolved. The $100,000 offer was accepted approximately two weeks after the transfer—approximately four months before the lien was resolved. In fact, Mutchler requested assistance from the attorney from the employer's um carrier to persuade the worker's compensation branch to resolve the lien issue; but the attorney was unable to assist, and the $100,000 settlement offer was accepted a few days later. The record is not clear regarding the date on which the $25,080 offer was accepted, but Mutchler acknowledged it was accepted before the worker's compensation lien was resolved. Consequently, the evidence supports a finding that the Ireson firm was responsible for procuring the settlements totaling $125,080 without acceptance of those offers being contingent on the Hightower firm obtaining reduction of the lien.

The Hightower firm presented evidence that it did later perform work to resolve the lien. However, this work was performed around the time of, and after, the mediation and was pertinent to the client's attempt to settle with his own um carrier—the $43,500 settlement agreement reached at mediation contingent on resolving the worker's compensation lien. The trial court gave the Hightower firm full credit toward its share of the fees for this work performed to further reduce the lien by $9,000 because the court credited the Hightower firm 33.77% of $9,000.

### *Settlement of $43,500*

The Hightower firm apparently contends the evidence is insufficient to

16

support a finding that the Ireson firm was 70% responsible for procuring the $43,500 settlement from client's um carrier. The evidence pertinent to this issue included the following: testimony of Hightower and Mutchler, who were originally called as adverse witnesses by the Ireson firm but also testified on behalf of the Hightower firm; client's original petition; various correspondence relative to client's case; and the Hightower firm's timeline.

The evidence demonstrated that the Ireson firm began representing client in March 2010 and remained its counsel until the transfer at the end of August 2011. The Hightower firm represented client from that point until the case was non-suited in April 2012, several months after the last issue (the worker's compensation lien) was resolved. The evidence further reflected the nature of the tasks performed by each firm on the case.

Before the transfer, the Ireson firm conducted the following activities toward advancing the claim against all defendants or client's um carrier in particular: met or communicated with client multiple times; sent representation letters; made a pre-suit demand; filed the petition; followed up on status of service on client's um carrier; answered discovery; received discovery responses from defendants; obtained and filed medical records and bills; prepared a motion for default judgment against client's um carrier (which eventually answered); filed an amended petition; and wrote an extensive letter to two defendants, including client's um carrier, demanding policy limits, with supporting analysis of client's damages. Counsel for the um carrier responded that it could not fully evaluate the demand until it reviewed client's past medical records to determine if he had pre-existing injuries, verified client's alleged lost wages, and took client's deposition.

Moreover, the trial court could have rationally inferred that the work performed by the Ireson firm also encompassed the following responsibilities,

typically attenuate to representing a personal-injury plaintiff: ensuring suit was filed within the limitations period; determining the proper defendants; locating all possible insurance coverage, such as the um coverage; ensuring the parties were properly served; analyzing client's medical records and lost wages information; and calculating a damages model. These services were relevant to all the settlements eventually tendered, including the $43,500.

After the transfer, the Hightower firm conducted the following activities toward settling the claim against client's um carrier, exclusive of activities toward resolving the worker's compensation lien: received and filed additional records regarding client's past medical history and employment records; supplemented discovery responses; prepared and presented client for deposition; and attended mediation.

The trial court could have reasonably concluded (1) the Ireson firm's activities, and attenuate responsibilities, were integral to advancing and settling the claim against the client's um carrier, and (2) the remaining work performed by the Hightower firm after the transfer—obtaining some additional records and supplementing discovery, presenting the client for deposition, and attending mediation—were the final steps toward obtaining the $43,000 settlement. Therefore, some evidence supports a finding that the Ireson firm was 70% responsible for procuring the $43,500 settlement, and the evidence is not so weak or against the overwhelming weight of the evidence that the finding is clearly wrong and unjust.

In summary, the Hightower firm's challenge to the trial court's apportionment of the fees lacks merit, and the evidence is legally and factually sufficient to support the judgment.

18

Accordingly, both of the Hightower firm's issues are overruled, and the trial court's judgment is affirmed.


/s/    John Donovan
Justice


Panel consists of Chief Justice Frost and Justices Christopher and Donovan. (Frost, C.J., concurring) (Christopher, J., dissenting).