# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00447-CV

**Appellant, Austin Capital Collision, LLC//Cross-Appellant, Barbara Pampalone**

**v.**

**Appellee, Barbara Pampalone//Cross-Appellees, Austin Capital Collision, LLC
and Eric Hinojosa**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 419TH JUDICIAL DISTRICT
NO. D-1-GN-14-003207, HONORABLE TODD T. WONG, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This appeal arises from a suit to enforce an oral loan agreement. Barbara Pampalone sued Eric Hinojosa and Austin Capital Collision, LLC (ACC) for breach of contract, seeking to recover amounts Pampalone alleged remained due under an unwritten $80,000 loan agreement and seeking to hold Hinojosa individually liable by piercing the corporate veil. The trial court, finding that the unwritten loan agreement was enforceable because ACC had partially performed, entered judgment against ACC but declined to hold Hinojosa individually liable. ACC appeals from the trial court's judgment against it, and Pampalone cross-appeals the trial court's judgment in favor of Hinojosa. For the reasons that follow, we affirm the trial court's judgment.

## BACKGROUND[1]

Hinojosa and Erik Pampalone, Barbara Pampalone's son (Erik), were childhood friends who went into business together. In 2002 or 2003, they formed two corporations, Hinojosa Auto Body and Paint, Inc. (Texas) and Hinojosa Auto Body and Paint, Inc. (Nevada), each having a 50% ownership in each corporation. Hinojosa contributed $90,000 and became president while Erik, who was named vice-president, contributed access to his credit and testified that he made a $2,000 contribution monthly. The corporations formed a general partnership, Capital Collision, GP (GP). GP operated in the Austin area under the assumed name Capital Collision. Erik continued to live in California, where he and Hinojosa had met, but testified that he came to Texas once or twice a year to help with the company books and set up practices to run the business more effectively.

Pampalone alleged that in 2005, Erik approached her about loaning GP $80,000 and that she did so in payments of $50,000 and $30,000. It is undisputed that there was no written loan agreement. GP began making payments on the loan by automatic deposits into Pampalone's account, which Erik testified he helped set up. The payments came from an account held in the names "Capital Collision" and "Eric A Hinojosa." In early 2007, Erik left GP, and after his departure, GP continued to make payments to Pampalone. In June 2009, Hinojosa formed a new entity called ACC. Hinojosa owns 99% of ACC and is its sole managing member, and his wife owns 1%. On the same day it was formed, ACC obtained an assumed name certificate for—and began to

---

[1] The factual and procedural background is taken from the record. Much of the factual background is disputed.

2

operate under—the same assumed name as GP (i.e., Capital Collision). It also employed the same employees, used the same email address, used the same email signature block indicating the same physical address, and conducted the same business. The parties dispute whether GP's assets were transferred to ACC; Hinojosa testified that there were no assets to transfer.

Beginning in April 2010, the payments to Pampalone began to be made from a different account held in the names "Capital Collision GP" and "Eric A Hinojosa." In July 2010, Hinojosa dissolved the Texas and Nevada corporations and, in turn, GP. After ACC was formed and GP was dissolved, regular automatic payments to Pampalone continued from the account held in the names "Capital Collision GP" and "Eric A Hinojosa" through April 2013. Between 2007, when Erik left GP, and 2013, there were email communications concerning the loan between Erik and GP/ACC employees at the GP/ACC email address and between Erik and GP/ACC's accountant. Erik also addressed a number of emails to Hinojosa, but any responses came from GP/ACC employees. Many of the emails included an attached amortization schedule that reflected the terms of the loan, and several of the emails contained discussions of the amount of interest paid each year for income tax reporting purposes.[2] In October 2013, Pampalone received one final payment of $6,000. After payments stopped, Hinojosa did not respond to Pampalone's email inquiry about further payments.

Pampalone filed suit against ACC and Hinojosa for breach of contract and attorney's fees pursuant to chapter 38 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8) (providing for recovery of attorney's fees in suit based on oral or written contract). Pampalone alleged that she had fully performed on the unwritten agreement, that GP had

---

[2] The amortization schedule reflected an interest rate of 7% and a term of 20 years.

3

partially performed by beginning to make monthly payments, and that ACC had assumed the loan

and continued partial performance by continuing to make payments in accordance with its terms.

Pampalone also alleged breach of contract against Hinojosa and sought to hold him individually

liable by piercing the corporate veil.  Prior to trial, the parties stipulated that if Pampalone were

entitled to damages, the amount of damages was $56,758.68, an amount calculated based on the

amortization schedule and an agreed Summary of Payments to Plaintiff, which reflected 94 regular

payments over approximately eight years, plus the final payment of $6,000.  They also stipulated as

to the amount of attorney's fees Pampalone had incurred prior to trial, that Pampalone's attorney was

qualified to testify, and that the hourly rates were reasonable.  Following a bench trial, the trial court

rendered judgment against ACC only for actual damages in the stipulated amount and attorney's fees

in the amount of $43, 241.32.[3]  This appeal and cross-appeal followed.

## STANDARD OF REVIEW

ACC challenges the trial court's determination that Pampalone established the partial

performance exception to the statute of frauds.[4]  This determination is found in both the trial court's

Finding of Fact No. 17 ("[T]he statute of frauds does not bar the agreement, even though it is not in

writing, because Plaintiff fully performed under the agreement, and Defendant Austin Capital

---

[3] Pampalone filed this suit as an expedited action under Rule 169.  *See* Tex. R. Civ. P. 169 (providing expedited process for suits in which plaintiff seeks only monetary relief aggregating $100,000 or less); *see also id.* R. 190.2 (providing discovery control plan for expedited actions). Consequently, her total recovery was limited to $100,000, and the amount awarded in attorney's fees was less than the stipulated amount.

[4] The parties do not dispute that in the absence of an exception, the statute of frauds would bar enforcement of the oral loan agreement.  *See* Tex. Bus. & Com. Code § 26.01(a), (b)(6) (requiring agreement that is not to be performed within one year to be in writing).

4

Collision, LLC, partially performed.") and its Conclusion of Law No. 51, which is virtually identical to Finding of Fact No. 17.  However, while the question of whether the statute of fraud applies is a question of law subject to de novo review, *see Bratcher v. Dozier*, 346 S.W.2d 795, 796 (Tex. 1961); *Stovall & Assocs. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 798 (Tex. App.—Dallas 2013, no pet.), the question of whether an exception applies is generally a question of fact, *see Stovall*, 409 S.W.3d at 798; *Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 705 (Tex. App.—Houston [1st Dist.] 1988, writ denied).  We thus construe both Finding of Fact No. 17 and Conclusion of Law No. 51— determining that the partial performance exception applied—as findings of fact, *see Stovall*, 409 S.W.3d at 798, and apply a legal sufficiency standard of review, *see Hightower, Russo, & Capellan v. Ireson, Weizel & Hightower, P.C.*, 420 S.W.3d 315, 319–20 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (construing as findings of fact writing issued by trial court entitled "Findings of Fact and Conclusions of Law" that did not separate findings and conclusions and that related to factual bases for trial court's ruling).[5]

When the appellant challenges the legal sufficiency of the evidence supporting an adverse finding on which he did not have the burden of proof at trial, he must demonstrate that there is no evidence to support the adverse finding.  *City of Keller v. Wilson*, 168 S.W.3d 802, 807–08

---

[5] Although in its briefing ACC appeared to urge that we apply a de novo standard of review, in oral argument, ACC stated that while the standard of review for the question of whether the statute of fraud applies is de novo, the standard of review for determining the partial performance exception to the statute of frauds is legal sufficiency.  Further, ACC argues that there is "no evidence" to establish partial performance, which constitutes a challenge to the legal sufficiency of the evidence. *See In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014) (referring to Texas's "traditional legal sufficiency—or 'no evidence'—standard of review"); *City of Keller v. Wilson*, 168 S.W.3d 802, 807–08 (Tex. 2005).

(Tex. 2005); *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Texas Dep't of Pub. Safety v. Alexander*, 300 S.W.3d 62, 72 (Tex. App.—Austin 2009, pet. denied). We review the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller*, 168 S.W.3d at 807. "Our traditional legal sufficiency—or 'no evidence'—standard of review upholds a finding supported by '[a]nything more than a scintilla of evidence.'" *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014) (quoting *Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)). More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). "However, if the evidence is so weak that it only creates a mere surmise or suspicion of its existence, it is regarded as no evidence." *Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014). With this standard of review in mind, we turn to ACC's issues on appeal.

## DISCUSSION

**ACC's Appeal**

In its first issue, ACC argues that the trial court erred in granting judgment for Pampalone because enforcement of the oral loan agreement is barred by the statute of frauds and there is no evidence of partial performance by GP or ACC.[6] Under the partial performance exception

---

[6] As Pampalone asserts on appeal, there is authority that full performance by one party takes an oral agreement out of the statute of frauds. *See Estate of Kaiser v. Gifford*, 692 S.W.2d 525, 525 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (holding that oral installment loan agreement was not barred by statute of frauds because lender had made full performance under agreement).

to the statute of frauds, contracts that have been partly performed but do not meet the requirements of the statute of frauds may be enforced in equity if denial of enforcement would amount to a virtual fraud. *Berryman's S. Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 418 S.W.3d 172, 192 (Tex. App.—Dallas 2013, pet. denied); *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pet. denied). "The fraud arises when there is strong evidence establishing the existence of an agreement and its terms, the party acting in reliance on the contract has suffered a substantial detriment for which he has no adequate remedy, and the other party, if permitted to plead the statute, would reap an unearned benefit." *Breezevale*, 82 S.W.3d at 439. The partial performance must be "unequivocally referable" to the agreement and corroborative of the fact that a contract actually was made.[7] *National Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426

However, many of the cases involving full performance also appear to rely on evidence of partial performance. *See, e.g.*, *Davis v. Insurtek, Inc.*, No. 05-09-01029-CV, 2010 Tex. App. LEXIS 10292, at *12 n.3 (Tex. App.—Dallas Dec. 30, 2010, no pet.) (mem. op.) (noting that Texas courts have used terms "full performance" and "partial performance" interchangeably when one party has fully performed and other party has partly performed); *626 Joint Venture v. Spinks*, 873 S.W.2d 73, 76 (Tex. App.—Austin 1993, no writ) ("[W]here one party to a contract has fully performed his obligations under it, the statute of frauds is unavailable to the other who knowingly accepts benefits *and partly performs*.") (emphasis added). In any event, because Pampalone alleged both her own full performance and ACC's partial performance, and because there is sufficient evidence to support the trial court's conclusions that Pampalone fully performed and ACC partially performed, we need not decide whether full performance by Pampalone alone would have taken the oral loan agreement out of the statute of frauds. *See* Tex. R. App. P. 47.1; *cf. Hawkins v. Myers*, No. 02-14-00123-CV, 2015 Tex. App. LEXIS 3473, at *17 n.7 (Tex. App.—Fort Worth Apr. 9, 2015, no pet.) (mem. op. on reh'g) (declining to address partial performance where appellant raised only full performance in trial court).

[7] In oral argument, Pampalone asserted for the first time that the "unequivocally referable" requirement does not apply here because it applies only in cases involving other contracts to which payment could have referred. We do not read the cases so narrowly. *See National Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426 (Tex. 2015) (stating without qualification that "one of the [partial performance] exception's requirements is that the performance on which the party relies must be 'unequivocally referable to the agreement'" and explaining that "[i]f the evidence establishes

(Tex. 2015) (per curiam); *Berryman's*, 418 S.W.3d at 192; *Holloway v. Dekkers*, 380 S.W.3d 315, 324 (Tex. App.—Dallas 2012, no pet.). "The performance a party relies on to remove a parol agreement from the statute of frauds 'must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced.'" *Berryman's*, 418 S.W.3d at 193 (quoting *Breezevale*, 82 S.W.3d at 439–40); *accord Dekkers*, 380 S.W.3d at 324. Otherwise, the acts of performance do not tend to prove the existence of the parol agreement the plaintiff seeks to enforce. *Berryman's*, 418 S.W.3d at 193; *Dekkers*, 380 S.W.3d at 324.

ACC does not dispute that 94 regular payments were made to Pampalone but contends that there is no evidence that any performance was "unequivocally referable" or "solely referable" to the purported loan agreement. ACC first asserts this argument as to GP's partial performance. ACC cites a lawsuit filed in California prior to this suit in which Erik sued Hinojosa alleging that the unwritten transaction was a personal loan from Erik to Hinojosa and that payments were due to Erik. ACC argues that the fact that Erik filed the California lawsuit "defeats any conceivable argument that the evidence establishes the payments referenced by Barbara were solely referable to the unwritten agreement she seeks to enforce." We do not find this argument persuasive.

---

that the party who performed the act that is alleged to be partial performance could have done so for some reason other than to fulfill obligations under the oral contract, the exception is unavailable") (quoting *Chevalier v. Lane's, Inc.*, 213 S.W.2d 530, 533 (Tex. 1948) (applying requirement that performance be unequivocally referable to oral contract on facts involving only one alleged oral contract)); *Holloway v. Dekkers*, 380 S.W.3d 315, 324 (Tex. App.—Dallas 2012, no pet.) (applying requirement that performance be unequivocally referable to alleged oral employment contract and concluding that payment of salary was not solely referable to alleged oral employment contract because it was referable to performance of services).

First, Erik testified that the California suit was nonsuited because he and Pampalone did not think that the claim asserted in it was the right one and that the lawyer was not authorized to assert it. In finding that Pampalone loaned $80,000 to "the owners of Capital Collision,"[8] the trial court could have credited Erik's testimony. As fact finder, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Iliff v. Iliff*, 339 S.W.3d 74, 83 (Tex. 2011) (citing *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 567 (Tex. 2000)). Further, Hinojosa testified to a contrary theory, asserting for the first time at trial that the loan payments GP and ACC made to Pampalone were to repay Erik's debt to Pampalone and that Hinojosa let the companies make the payments to help Erik. The trial court could have discredited Hinojosa's testimony, and, in fact, expressly stated its lack of belief in Hinojosa's credibility.[9] *See*

[8] ACC emphasizes the word "owners" in this finding, putting it in quotation marks in each of several references to it and adding the phrase, "including [Pampalone's] son." In oral argument, ACC argued that the reference to the "owners" made it unclear who the borrower was. However, the finding states that the owners were the Texas and Nevada corporations "as general partners of Capital Collision, GP." Further, we observe that Pampalone alleged in her petition that she had entered into a loan agreement with "Capital Collision." Similarly, she testified that the loan was for "Capital Collision," the loan was for "the business," and that she loaned the money to the company, Capital Collision, not to Erik personally; that she understood the money was to be used in part to purchase land for the business; that Erik was not trying to purchase any land for his own personal use at the time; that she gave the first $50,000 to Erik to give to Capital Collision; and that she had previously loaned money to Capital Collision, which was repaying her at the time of this loan.

[9] The trial court entered the following "Other Findings by the Court":

48. Defendant Eric Hinojosa lacks credibility, especially in light of the fact that Eric Hinojosa was wholly unprepared for his corporate representative deposition, had not reviewed a single document produced in the lawsuit or otherwise talked to any Austin Capital Collision, LLC, employees or representatives regarding the designated deposition topics, and demonstrated a repeated inability to provide substantive responses on his own behalf or on behalf of Austin Capital Collision, LLC. Further, at trial of this cause, Eric Hinojosa tried to change many of the answers he provided at his deposition which occurred approximately one month before trial.

9

*McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (stating that trial court may choose to believe one witness and disbelieve others and resolve inconsistencies in any witness's testimony); *see also City of Keller*, 168 S.W.3d at 819. We defer to the trial court's first-hand assessment of Hinojosa's credibility and demeanor. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000) ("Because the trier of fact has the ability to examine the witness's demeanor, we must defer to its credibility determinations.").

In addition, the evidence supports the trial court's finding that Pampalone fully performed and GP partly performed under the contract. As evidence of her full performance, Pampalone testified that she mortgaged her home in order to make the loan; that the loan was to Capital Collision, not to Erik personally; that the loan was to be at 7% for 20 years; that she gave Erik $50,000 "for him to give to [GP]"; that she wrote a check to Union Bank for the $30,000 balance of the loan; and that "that money was then sent to [GP]." Erik testified that he and Hinojosa discussed asking Pampalone for a loan to use for the possible purchase of the land on which the business operated; that he asked Pampalone to loan GP $80,000 at 7% interest over 20 years; that Pampalone gave him $50,000; that he deposited it into GP's account using Quicken Bill Pay; and that Quicken Bill Pay made a direct mail deposit into GP's account through Metavante Corp., which he believed is "some type of pass-through entity for . . . Intuit," the company that sells Quicken products. The bank statements of GP admitted into evidence reflected a deposit from Metavante Corp. for $50,000 and a "counter credit" for $30,000 on dates that coincided with the approximate dates to which Pampalone and Erik testified the payments were made. And the terms of the loan to which Pampalone and Erik testified were reflected on the amortization schedule.

10

Concerning GP's partial performance, GP's bank statements reflected monthly debits, for "Barbara Pampalone Bill Payment" in the amount of $657.09, the amount of the monthly payment indicated on the amortization schedule. Pampalone testified that she never saw the checks but that deposits in the amount of $657.09 showed up on her Fidelity account statements, and further testified that if a payment was missed, she would tell Erik, who would call Hinojosa, and the payments would resume. Fidelity records entered into evidence included copies of monthly checks from the GP account payable to "Barbara Pampalone" in the amount of $657.09.[10] Erik testified that he helped set up the automatic payments to Pampalone; that Hinojosa was aware of it; that the purpose of the payments was to repay the $80,000 loan from Pampalone; and that at times when the payments stopped, he would call Hinojosa and ask him to figure out what happened, and the payments would resume.

Further, email communications from Erik to Hinojosa and between Erik and GP employees and representatives reflect GP's payments on the loan from Pampalone. At the beginning of each year, Erik emailed GP employees, reported the amount of interest on the loan GP had paid the prior tax year, and attached the amortization schedule. At times, Erik also emailed Hinojosa informing him of the amount of interest paid and attached the amortization schedule, and Erik exchanged emails with GP's accountant concerning the interest GP paid, attaching the amortization schedule. In one exchange, GP's accountant referred to Erik's "mom's loans,"[11] and in another, Erik

---

[10] As Pampalone testified, the bank records reflect that some monthly payments were missed but that payments were subsequently resumed. The records also indicated, as Pampalone testified, that in June 2011, the amount of the payments changed from $675.09 to $675.00.

[11] As noted above, Pampalone had previously loaned GP money, but that loan was taken over by Erik when he left the company and is not a part of this lawsuit.

11

states that Hinojosa had asked him to forward the information to GP's accountant. Erik testified that none of the emails to GP "bounced back" and that at no time did Hinojosa or any GP employee or representative respond by asking him to what loan he was referring.

As for its own liability, ACC argues that the same defects that defeat liability as against GP also defeat Pampalone's efforts to enforce the alleged loan agreement against ACC: The alleged assumption of the loan was unwritten, and there is no evidence that any payments were solely referable to the alleged loan. ACC also argues that ACC did not make payments to Pampalone because the payments came from an account held in the names "Capital Collision GP" and "Eric A Hinojosa," and not ACC's account. However, the evidence supports the trial court's finding that ACC assumed the loan and partly performed under the contract. The evidence showed that ACC continued operating the same business as GP, employed the same employees, used the same assumed name, used the same email address, used the same email signature block indicating the same physical address, and assumed control of the bank account into which Pampalone's loan funds had been deposited. Thus, ACC accepted the benefits of the unwritten loan proceeds. *See 626 Joint Venture v. Spinks*, 873 S.W.2d 73, 76 (Tex. App.—Austin 1993, no writ) (stating that statute of frauds is unavailable to party who accepts benefits of oral contract and partially performs). In addition, between July 2010, when GP was terminated, and October 2013, when the last payment was made, the bank statements of ACC and GP reflect multiple transfers of funds in substantial amounts from the account held in the names "Capital Collision" and "Eric A Hinojosa"—after it was taken over by ACC—to the newly created account in the names of "Capital Collision GP" and "Eric A Hinojosa," and there were continued monthly payments to Pampalone from the latter

12

account.  Although Hinojosa denied that those funds were transferred to pay Pampalone and testified that instead he "personally" deposited funds into the GP account to pay her, the trial court could have discredited that testimony.  *See Iliff*, 339 S.W.3d at 83; *City of Keller*, 168 S.W.3d at 819; *McGalliard*, 722 S.W.2d at 697.

Further, the record contains continued email communications that reflect ACC's assumption of and partial performance on the loan.  In May 2011, Erik emailed Hinojosa at what had become the ACC email address, attaching the amortization schedule.  In early 2012, Erik emailed Hinojosa at the ACC email address, reporting the amount of interest paid in 2011.  And in September 2012, when Erik emailed Hinojosa informing him that Pampalone had changed accounts and asked that the deposits be sent to the new account, he received a reply from an ACC employee, Hinojosa's sister-in-law, stating, "Received and Updated.  Thank You!"  On this record, we conclude that there was more than a scintilla of evidence that the payments made by GP and ACC to Pampalone were unequivocally referable to the $80,000 loan from Pampalone and corroborative of the fact that a contract was made with Pampalone.  *Westergren*, 453 S.W.3d at 426; *Burbage*, 447 S.W.3d at 259; *In re K.M.L.*, 443 S.W.3d at 112; *City of Keller*, 168 S.W.3d at 807; *Berryman's*, 418 S.W.3d at 193.

Viewing the evidence in the light most favorable to the verdict, we therefore further conclude that there was more than a scintilla of evidence to support the trial court's findings that ACC assumed GP's debt on the loan from Pampalone and partially performed.  *See Thomas v. Miller*, No. 06-15-00095-CV, 2016 Tex. App. LEXIS 8322, at *20–21 (Tex. App.—Texarkana Aug. 4, 2016, no pet.) (concluding that partial performance exception was met where contract for

13

sale of land did not contain sufficient property description and therefore failed to meet statute of frauds but buyer moved into home, made monthly payments to bank for five years, paid property taxes, and made repairs with seller's knowledge and consent); *Aguirre v. Pompa*, No. 11-14-00168-CV, 2016 Tex. App. LEXIS 5312, at *7–10 (Tex. App.—Eastland May 19, 2016, no pet.) (mem. op) (concluding that partial performance exception applied where evidence showed purchaser paid purchase price, took possession of land, and moved personal property onto land, and seller provided receipts showing full payment); *Stovall*, 409 S.W.3d at 801 (holding that partial performance removed oral lease agreement from statute of frauds where lessee occupied property and paid rent for more than one year, and email communications reflected lessor accepted rent and provided maintenance services); *Cottman Transmission Sys., L.L.C. v. FVLR Enters., L.L.C.*, 295 S.W.3d 372, 378–79 (Tex. App.—Dallas 2009, pet. denied) (concluding that payment of rent was "good indication" that party was assuming lease and holding that there was partial performance so as to remove lease from statue of frauds where party took other actions consistent with assumption of lease, including entering into management agreement he had no authority to enter unless he had assumed lease and placing manager at and securing utilities for premises); *Spinks*, 873 S.W.2d at 74, 76 (concluding that there was legally sufficient evidence to support jury's finding that joint venture, created after closing on sale of property, agreed to pay indebtedness underlying note where joint venture signed no written agreement to pay debt but assumed benefits of note by actively managing property, including making permanent improvements, listing it as asset on tax returns, and making payments to sellers); *Estate of Kaiser v. Gifford*, 692 S.W.2d 525, 525–26 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (noting rule that "where one party fully performs a contract, the

14

Statute of Frauds is unavailable to the other who knowingly accepts benefits and partly performs"). We overrule ACC's first issue.

In its second issue, ACC argues that because Pampalone did not establish partial performance, there is no theory by which contractual claims can be sustained against ACC, and the award of attorney's fees under chapter 38 must therefore be overturned as well. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8) (providing for recovery of attorney's fees in suit based on oral or written contract). Having determined that there was legally sufficient evidence to support the trial court's finding of partial performance, we overrule ACC's second issue.

**Pampalone's Cross-Appeal**

In a single issue on cross-appeal, Pampalone argues that the trial court erred in failing to impose alter ego liability on Hinojosa for breach of contract based on its factual findings and the undisputed evidence. The elements of alter ego in a breach of contract case are: (1) the defendant has a financial interest in, ownership of, or control of the corporation, (2) there is unity between corporation and defendant so that separateness has ceased, (3) it would be an injustice to hold only the corporation liable, (4) the defendant caused the corporation to be used for perpetrating a fraud, and (5) the defendant perpetrated an actual fraud for his direct personal benefit. *See* Tex. Bus. Orgs. Code § 21.223(b); *Mancorp., Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990); *Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc.*, 879 S.W.2d 89, 108 (Tex. App.—Houston [14th Dist.] 1994, writ denied). Pampalone argues that the trial court's findings of fact support an affirmative finding on each of these elements. On this record, we cannot agree.

15

In arguing that the elements of alter ego were supported by the trial court's findings, Pampalone cites Findings of Fact Nos. 22–39 and 48.[12] These findings are listed under subheadings that identify which aspects of the trial court's determinations they support. Findings of Fact Nos. 22–39 are included under the subheadings "Defendant Austin Capital Collision's Assumption of the Loan" and "Austin Capital Collision, LLC's, Default on the Loan" and contain factual findings related to ACC's assumption of, partial performance on, and breach of the loan agreement. Finding of Fact No. 48, stated under the subheading "Other Findings by the Court" and quoted above, contains the trial court's finding that Hinojosa lacked credibility, which explains why the findings reflect that the trial court discredited Hinojosa's testimony. However, the trial court's findings include no express references to unity or lack of separateness between Hinojosa and the companies or commingling of personal and company funds,[13] and they contain no mention of fraud[14] or injustice

---

[12] She also cites Finding of Fact No. 57 but, in doing so, quotes from Finding of Fact No. 29.

[13] Although Hinojosa testified that he "personally" deposited funds into the GP account, he did not testify as to where those funds came from, and to the extent he intended to state that they were his personal funds, the trial court could have discredited his testimony. *See Iliff v. Iliff*, 339 S.W.3d 74, 83 (Tex. 2011); *City of Keller*, 168 S.W.3d at 819; *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). There is no reference to Hinojosa's depositing personal funds into either company account in the Findings of Fact and Conclusions of Law. Rather, Finding of Fact No. 33 states only that Hinojosa "intentionally put money into the Bank of America account held in the names of 'Eric Hinojosa' and 'Capital Collision, GP' to cover the monthly bill payments to Plaintiff on the loan," and the record reflects that on multiple occasions, substantial funds were transferred from the ACC bank account to the GP bank account.

[14] In oral argument, Pampalone argued that the trial court's Finding of Fact No. 28. that Hinojosa failed to provide Pampalone with statutory notice that he was terminating the corporations and GP is an alter ego finding of fraud—an argument she asserted is based on federal authority. Having failed to raise this argument in her briefing, Pampalone has waived it. *See* Tex. R. App. P. 38.1(i). Further, even if we were to construe Finding of Fact No. 28 as a finding of fraud, we would, as discussed below, decline to presume the omitted finding of injustice necessary to pierce the corporate veil. *See Mancorp., Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990).

in holding only ACC liable. Thus, considering the findings relied on by Pampalone in the context of the trial court's explanatory subheadings and its oral pronouncement that it did not "believe there was evidence presented which would warrant that finding in attempting to defraud others by using the entity to do so," we conclude that the trial court's findings support the trial court's determinations concerning ACC's assumption of the loan and partial performance under it and that the trial court did not enter findings of fact in support of Pampalone's alter ego theory.

If the trial court's findings of fact do not include any elements of a ground of recovery or affirmative defense, then the party relying on the ground of recovery or affirmative defense must specifically request additional findings in proper form; the failure to request the additional findings results in the waiver of any complaint regarding the unmentioned ground. *See* Tex. R. Civ. P. 298 (after trial court files original findings and conclusions, any party may file request for specified additional or amended findings or conclusions); *Briggs Equip. Trust v. Harris Cty. Appraisal Dist.*, 294 S.W.3d 667, 674 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)*; Cooper v. Cochran*, 288 S.W.3d 522, 531 (Tex. App.—Dallas 2009, no pet.) (op. on reh'g). Pampalone did not request any amended or additional findings of fact and conclusions of law. Therefore, because the trial court entered no findings as to Pampalone's alter ego cause of action and Pampalone requested none, we conclude that Pampalone has waived her complaint on appeal regarding the lack of a finding in support of her alter ego theory. *See* Tex. R. Civ. P. 298; *Briggs*, 294 S.W.3d at 674; *Cooper*, 288 S.W.3d at 531; *see also* Tex. R. App. P. 33.1.

Even if we were to construe the findings of fact as addressing some elements of Pampalone's alter ego claim, we would conclude that there is no finding on the element of injustice

17

and that the evidence does not support a deemed finding that it would be an injustice to hold only ACC liable. *See* Tex. R. Civ. P. 299 (when court's findings address one or more elements of ground of recovery, we presume findings on omitted, unrequested elements when supported by evidence); *Saulsberry v. Ross*, 485 S.W.3d 35, 41 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (same, citing Rule 299). Pampalone now argues that limiting liability to ACC would work an injustice because Hinojosa "emptied the original debtor to make a new company without telling anyone" so that Pampalone cannot be paid from GP because it no longer exists and because the bank records showed that the GP account was being used for little more than making monthly loan payments to Pampalone. However, we have already upheld the trial court's findings that ACC assumed the loan and partially performed, and it is ACC's, not GP's, corporate veil Pampalone seeks to pierce.

As plaintiff, Pampalone had the burden of proof on alter ego. *See Torregrossa v. Szelc*, 603 S.W.2d 803, 804 (Tex. 1980); *Capital Fin. & Commerce AG v. Sinopec Overseas Oil & Gas, Ltd.*, 260 S.W.3d 67, 82 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Although Pampalone asserts that "there is a substantial likelihood that the [amount of the debt that exceeds the supersedeas bond will] go unpaid" if ACC is "the only responsible party," she offered no current bank records for ACC and no other documentary or testimonial evidence that ACC does not have the funds to pay the remainder of the judgment, and she offered only speculation that Hinojosa will take future actions to evade the debt. Therefore, even if we were to determine that the trial court's findings addressed some elements of the alter ego theory, we would decline to presume the omitted element of injustice for lack of evidence. *See* Tex. R. Civ. P. 299; *Saulsberry*, 485 S.W.3d at 41; *Walker v. Whitman*, 759 S.W.2d 781, 783 (Tex. App.—Fort Worth 1988, no writ) (declining to

18

presume omitted findings where court found no evidence to support omitted findings and concluding that conclusion of law based on findings on only some elements of theory could not sustain judgment). We overrule Pampalone's single issue on cross-appeal.

## CONCLUSION

Having overruled ACC's issues on appeal and Pampalone's issue on cross-appeal, we affirm the judgment of the trial court.

_____
Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Bourland

Affirmed

Filed: December 8, 2016